HOWARTH & SMITH
DON HOWARTH, State Bar No. 53783
  dhowarth@howarth-smith.com
SUZELLE M. SMITH, State Bar No. 113992
  ssmith@howarth-smith.com
KATHRYN LEE BOYD, State Bar No. 189496
  lboyd@howarth-smith.com
523 West Sixth Street, Suite 728
Los Angeles, California 90014
Telephone: (213) 955-9400
Facsimile:  (213) 622-0791

Attorneys for Plaintiff
LAWRENCE B. LOCKWOOD, PANIP, LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LAWRENCE B. LOCKWOOD, PANIP, LLC,

                    Plaintiffs,

         vs.

SHEPPARD, MULLIN, RICHTER &HAMPTON, LLP, JONATHAN HANGARTNER, STEVE P. HASSID,

                    Defendants.

CASE NO.  CV09-5157 JFW (AGRx)

The Honorable John F. Walter
Ctrm: 16

**DECLARATION OF JOHN R. THOMAS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE**

Hearing Date:  November 9, 2009
Time:  1:30 p.m.
Ctrm:  16

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DECLARATION OF JOHN R. THOMAS

1    1.    Personal Background. I am a tenured, full Professor of Law at the

2  Georgetown University Law Center in Washington, D.C.   I currently teach courses in

3  patent law and international intellectual property law.  Prior to taking the position at

4  Georgetown University, I served as an Associate Professor at the George Washington

5  University, also in Washington, D.C.  I am admitted to the patent bar and formerly

6  worked as a practitioner before the courts and the U.S. Patent & Trademark Office

7  ("PTO").  I received a J.D. from the University of Michigan Law School and an LL.M.

8  in Patent and Intellectual Property Law from George Washington University Law

9  School. I also received a B.S. degree in Computer Engineering from Carnegie Mellon

10  University.  I worked for many years as an Instructor at the PTO Patent Academy

11  under the direct supervision of the current Commissioner of Patents.  In this capacity, I

12  trained numerous patent examiners on principles of patent law and procedure.  I have

13  served as a Special Master in seven patent infringement cases in federal district court.

14  I have also served as an expert witness in the field of patent law and procedure in

15  numerous U.S. patent cases involving the PTO as well as patent cases abroad.

16    2.    I have published widely in the field of patent law and practice before the

17  PTO, including an intellectual property law hornbook and a patent law treatise that

18  review PTO procedures.  I have also published articles addressing PTO procedures

19  and practice in such journals as the University of Illinois Law Review and the

20  Berkeley Technology Law Journal.  In addition, I have testified before Congress on

21  several occasions, with some of my testimony directed towards improving patent

22  quality through reform of PTO procedures.  My curriculum vitae is attached as Exhibit

23  A.

24    3.    I have been retained by Lawrence B. Lockwood and PANIP, LLC, to

25  assist them in this litigation.  I have been asked: (1) to explain the customary and

26  procedural aspects of the patent reexamination process through the PTO which are

27  commonly known and understood by members of the patent bar, and (2) to explain the

28  duties and obligations of licensed patent attorneys towards the PTO in the context of

1

1   reexamination.  In addition, I have been asked to review and give my opinion on

2   whether, under the facts of this case, those duties and obligations have been fulfilled

3   based upon the reasonably objective standards set by patent law and regulations.  I am

4   compensated for my time in this matter at an hourly rate of $600.

5       4.   Materials Reviewed.

6       In preparing this declaration I have reviewed U.S. Patent No. 6,289,319 (the

7   '319 Patent), U.S. Patent No. 5,576,951 (the '951 Patent) (the "Patents"), and U.S.

8   Patent No. 4,359,631 (the "631 Patent"), which was subsequently reissued as U.S.

9   Patent No. Re. 32,115.  I have also reviewed the reexamination files of the '319 Patent

10   and '951 Patent, including the two Requests for Reexamination for the '319 Patent and

11   '951 Patent filed on May 5, 2003, by Sheppard Mullin, Richter & Hampton LLP

12   ("Sheppard Mullin").  In addition, I have reviewed the Declaration of Mr. David G.

13   Kay.

14       5.   This analysis is preliminary and subject to change based on continuing

15   investigation during discovery and subject to receipt of additional information or

16   reports from either party or their experts.  I therefore reserve the right to amend or

17   supplement my opinions accordingly.

18       6.   Summary of this Declaration.

19       In my professional opinion as an expert in PTO procedure and the professional

20   obligations of those who practice before the PTO, the two Requests for Reexamination

21   materially misrepresented the application of prior art references to the claims of the

22   '319 and '951 Patents.  Absent these representations, the USPTO would not have

23   reached its decision to grant the two Requests for Reexamination.  As a direct result of

24   these misrepresentations, a cloud was placed over the '319 and '951 Patents that

25   resulted in their effective unenforceability during the lengthy pendency of the two

26   reexamination proceedings.

27   / / /

28   / / /

2

Background of Patent Law Terms Commonly Understood by the Patent Bar and Applied To Evaluation of Requests for Reexamination

      7.    The Requirement of Novelty.

In order to be patentable, an invention must be novel. A determination of novelty requires two distinct inquiries. First, a determination must be made as to which sources from the universe of available knowledge are pertinent to the novelty inquiry. The Patent Act defines these sources—usually termed "references"—that may be used to judge the novelty of the claimed invention in 35 U.S.C. §102. The sum of these references is denominated the "prior art." Once the prior art has been identified, the second inquiry is whether the invention described in the patent is identical to any one of those prior art references. It is important to note that a claimed invention is novel unless a single reference strictly anticipates it—that is to say, unless a single prior art reference discloses each and every limitation of the claim. This fundamental patentability standard was widely known and accepted by those licensed to practice before the PTO in 2003 at the time of the Requests for Reexamination were made. It was also set forth in case law well known to those licenses to practice before the PTO in this time frame. See, e.g., *Amgen, Inc. v. F. Hoffman-LA Roche Ltd.*, 580 F.3d 1340 (Fed. Cir. 2009).

      8.    Requirement of Non-obviousness.

In addition to meeting the requirement of novelty, the claimed invention must also be non-obvious. Section 103(a) of the Patent Act explains that an invention may not be patented "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006). The definitions of obvious and non-obvious are well known to patent law practitioners. For example, in its recent opinion in *KSR v. Teleflex*, 550 U.S. 398, 399 (2007), the Supreme Court confirmed its earlier holding in *Graham v. John Deere Co.*, 383 U.S. 1 (1966) that "[u]nder § 103,

3

DECLARATION OF JOHN R. THOMAS

1    the scope and content of the prior art are to be determined; differences between the

2    prior art and the claims at issue are to be ascertained; and the level of ordinary skill in

3    the pertinent art resolved . . . .  Such secondary considerations as commercial success,

4    long felt but unresolved needs, failure of others, etc., might be utilized to give light to

5    the circumstances surrounding the origin of the subject matter sought to be patented.

6    As indicia of obviousness or non-obviousness, these inquiries may have relevancy."

7    383 U.S. at 17-18.  A practitioner before the PTO during the period the requests for

8    reexamination were made in this case would have been aware of the definitions of

9    obvious and non-obvious and the standards regarding the same.

10        9.    The Manual of Patent Examining Procedure.

11        The PTO publishes a lengthy practice manual titled the Manual of Patent

12   Examining Procedure, or MPEP.  In my experience, attorneys practicing before the

13   PTO must be and are very familiar with the MPEP.  "The MPEP [is] commonly relied

14   upon as a guide to patent attorneys and patent examiners on procedural matters."

15   *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed.Cir.1984).  *See Ethicon,*

16   *Inc. v. Quigg*, 849 F.2d 1422, 1425 (Fed. Cir.1988); *In re Kaghan*, 387 F.2d 398, 401

17   (1967) ("[A]n applicant should be entitled to rely not only on the statutes and Rules of

18   Practice but also on the provisions of the MPEP in the prosecution of his patent

19   application.") (cited with approval in *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1368,

20   1375-76 (Fed. Cir. 2004)).

21        10.   While the MPEP does not have the force of law, it is entitled to judicial

22   notice as representing the PTO's interpretation of statutes or regulations.  *Molins PLC*

23   *v. Textron*, 48 F.3d 1172, 1180 n. 10 (Fed. Cir.1995) (The MPEP "does not have the

24   force of law, [but] is entitled to judicial notice as an official interpretation of statutes

25   or regulations as long as it is not in conflict therewith.").   Practitioners before the

26   PTO must be and are aware that patent examiners rely on the MPEP.

27   / / /

28   / / /

4

Fundamentals of So-Called Ex Parte Reexaminations

11.     Reexamination proceedings were introduced into the patent system in 1980.  In 1999, Congress renamed the existing proceedings "*ex parte* reexaminations," and also introduced a new sort of proceeding termed an "*inter partes* reexamination." American Inventors Protection Act of 1999, Pub. L. No. 106-113.  Under the *ex parte* reexamination regime, any person may challenge an issued patent by citing a prior art patent or printed publication to the PTO.  It is insufficient merely to place prior art references before the examiner; rather, pursuant to Section 302, the examiners rely on the writing setting forth "pertinency and manner of applying cited prior art to every claim for which reexamination is requested." 35 U.S.C. § 302 (2006).  This requirement for characterizing and comparing the prior art with the patented invention in a formal written request was also widely known and accepted by those licensed to practice before the PTO in 2003 at the time of the Requests for Reexamination were made.

12.     The Patent Act next requires the PTO to "determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request, with or without consideration of other patents or printed publications."  35 U.S.C. § 303(a) (2006).  The PTO is allotted only three months from the date the request for reexamination was filed to reach this decision.  *Id.*  The PTO considers the standard for reexamination met when "there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication *important* in deciding whether or not the claim is patentable." MPEP § 2642 (emphasis in original).  If a substantial new question of patentability exists, the USPTO will issue an order for reexamination of the relevant patent. 35 U.S.C. § 304 (2006).  Additionally, examiners are instructed to "not decide, and no statement should be made as to, whether the claims are rejected over the patents and printed publications" in the order granting the request for reexamination. MPEP § 2246.

/ / /

5

DECLARATION OF JOHN R. THOMAS

1   These procedures were widely known and accepted by those licensed to practice
2   before the PTO in 2003 at the time of the Requests for Reexamination were made.

3         13.    The reexamination proceeding then continues following the usual rules
4   for examination of applications. 35 U.S.C. § 305 (2006). The PTO examiner
5   compares the teachings of early publications, patents, and other relevant prior art with
6   a patent's claims in order to determine whether the patented invention meets the
7   requirements of novelty and non-obviousness. The examiner then issues a "First
8   Office Action," that may either uphold the patent, or reject it in whole or in part. 35
9   U.S.C. § 132(a) (2006). A patent applicant is afforded an opportunity to respond to an
10  *examiner's* rejection. Typical applicant responses include argument that the
11  examiner's rejection was improper, or the introduction of amendments to the claims in
12  order to overcome a rejection based upon the prior art. Id.

13        14.    If the examiner remains unconvinced by the applicant's response, he will
14  issue a Second Office Action titled a "Final Rejection." Dissatisfied applicants may
15  pursue an appeal at the PTO Board of Patent Appeals and Interferences. 35 U.S.C. §
16  306 (2006). The reexamination proceeding terminates with the issuance of a
17  certificate that may confirm or cancel particular claims of the patent, and possibly
18  incorporate new or amended claims as well. 35 U.S.C. § 307 (2006).

19        15.    It should be appreciated that although this proceeding is nominally
20  termed an "*ex parte* reexamination," it does not operate in an ex parte fashion in the
21  usual sense, meaning that there is no adversary or opponent in the proceeding. As a
22  matter of fact, the patent holder in a reexamination proceeding is given notice and
23  asked to file an opposition to the challenge to his patent. Also, as patent practitioners
24  are well aware, an ex parte reexamination before the PTO is not like the ex parte
25  appearance in other contexts.

26        For example, Black's Law Dictionary defines ex parte as a "proceeding in which
27  not all parties are present or given the opportunity to be heard." Black's Law
28  Dictionary 1221 (7th ed.1999). In *United States v. Abreu*, 202 F. 3d 386 (1st Cir.

6

1    2000), the court defined "*ex parte*" as "[d]one or made at the instance and for the

2    benefit of one party only, and without notice to, or argument by, any person adversely

3    interested." Id. at 390.

4       This definition of the term *ex parte* does not appropriately describe the so-called

5    *ex parte* reexamination proceeding before the PTO which is a hybrid of *ex parte* and

6    *inter partes* practice. *In re Opprecht*, 868 F.2d 1264, 1265 (Fed. Cir. 1989). Once the

7    PTO determines that the requestor's submissions raise a substantial new question of

8    patentability to exist, it customarily issues a First Office Action rejecting at least some

9    of the patent's claims. *See* Roger E. Schechter & John R. Thomas, Principles Of

10    Patent Law § 7.5 (2d. ed. 2004) ("Because the PTO has determined that a substantial

11    new question of patentability exists, ordinarily the First Office Action includes a

12    rejection of at least one of the claims." ). The patent proprietor is then given notice

13    and afforded multiple opportunities to respond to the PTO rejection. 35 U.S.C. § 305

14    (2006). If the patent proprietor does not respond to this rejection in a manner

15    satisfactory to the PTO, then the rejected claims will be cancelled. 35 U.S.C. § 307

16    (2006).

17      16.    In addition, the reexamination statute also allows a patent owner to file a

18    preliminary statement following the PTO's issuance of the order for reexamination.

19    35 U.S.C. § 304 (2006). If the patent owner does so, then the requestor may file a

20    reply to the patentee's statements. *Id.* This interchange does not commonly occur

21    because the PTO has already made the determination that a substantial new question

22    of patentability exists, and patent owners do not commonly invite further participation

23    by the patent's opponent. *See* Roger E. Schechter & John R. Thomas, Principles Of

24    Patent Law § 7.5.4.1 (2d ed. 2004) ("As a practical matter, because most patentees do

25    not wish to encourage further participation by the requestor, few preliminary

26    statements are filed."). The possibility of this additional round of argument between

27    the patent owner and the patent's challenger nonetheless reveals that Congress did not

28    fashion these procedures in a manner typical for *ex parte* proceedings.

7

1        17.    *Ex parte* reexaminations therefore follow a set of procedures quite

2    distinct from more traditional ex parte proceedings, such as obtaining a license with

3    the Federal Communications Commission.  Not only does the USPTO hear from both

4    the reexamination requestor and the patent proprietor during the so-called ex parte

5    reexamination proceedings, the views advanced by the party whose interest is

6    adversely affected—the patent proprietor—constitute the core component of the

7    proceeding.    It is my expert opinion that the reexamination proceedings before the

8    PTO involving the Lockwood Patents were not ex parte non adversarial proceedings

9    of the type that may occur before the Federal Communications Commission.  Mr.

10   Lockwood as the patent holder was given notice by the PTO of the Request for

11   Reexamination and did in fact appear through counsel before the PTO to defend his

12   patents.

13   <u>Relevant Legal Requirements for Practice Before the PTO</u>

14       18.    Both the courts and the PTO itself have long recognized that this agency

15   relies to a great extent upon forthright conduct by licensed patent practitioners.

16   Practitioners before the PTO are aware that they are held to the highest degree of

17   candor and good faith and that this is the premise upon which the patent system

18   operates. *See, e.g., Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949) ("[T]he

19   relationship of attorneys to the Patent Office requires the highest degree of candor and

20   good faith.") (cited with approval in *Lipman v. Dickinson*, 174 F.3d 1363 (Fed. Cir.

21   1999)).  The PTO's reliance upon the patent bar is in part reflected by the certification

22   requirement that the agency imposes upon individuals who wish to practice before it.

23   Uniquely among administrative agencies in the United States, the PTO requires

24   potential patent practitioners to pass a special examination in order to demonstrate

25   their competence.  35 U.S.C. § 31 (2006); *see* Lisa Kennedy, *Patent Agents:  Non-*

26   *Attorneys Representing Inventors Before the Patent Office*, 49 Advocate 21 (July

27   2006).

28   / / /

8

19.   Individuals who pass the patent bar examination become members of a specialized bar in which the PTO reposes a great deal of trust.  The PTO maintains no scientific laboratories to confirm the arguments of individuals requesting reexamination.  Examiners cannot compel production of evidence in reexamination and other proceedings.  Further, examiners are only allocated a short amount of time in which to perform their duties, including reviewing and responding to a reexamination request.

20.   It should further be appreciated that the PTO is widely regarded as an agency "in crisis." *See, e.g.*, Dan L. Burk & Mark A. Lemley, The Patent Crisis And How The Courts Can Solve It (2009).  PTO examiners have variously been described as overworked, overextended, undertrained, and underpaid. *See, e.g.*, Amy Tindell, *Toward A More Realistic Fact-Finder in Patent Litigation*, 13 Marq. Intell. Prop. L. Rev. 309 (2009); Thomas M . Mackey, *Nanobiotechnology, Synthetic Biology, and RNAI: Patent Portfolios for Maximal Near-Term Commercialization and Commons for Maximal Long-Term Medical Care*, 13 Marq. Intell. Prop. L. Rev. 123 (2009). This is consistent with my personal and expert experience.  Even in a time of economic downturn, the number of patent applications filed each month is significantly greater than just a few years ago.   These unfavorable conditions have increased the reliance of PTO examiners upon the honest and forthright conduct of patent lawyers. "The PTO, faced with an increasing volume of applications, relies upon the applicant to provide it with material to be used for consideration of the patent and to relieve it of the duty of conducting extensive prior art searches." Todd M. Becker, *Attorney-Client Privilege Versus the PTO's Duty of Candor: Resolving the Clash in Simultaneous Patent Representations*, 71 Wash. L. Rev. 1035, 1045 (1996). These facts were widely known and understood by the patent bar in 2003 at the time of the Requests for Reexamination of the Lockwood Patents were made.

/ / /

/ / /

9

21.     In view of these circumstances, the PTO maintains a Code of Professional Responsibility that governs practice before that agency. 37 C.F.R. §§ 10.20 *et seq*. 37 C.F.R. § 10.18 provides:

(b) By presenting to the Office (whether by signing, filing, submitting, or later advocating) any paper, the party presenting such paper, whether a practitioner or non-practitioner, is certifying that—

(1)  All statements made therein of the party's own knowledge are true, all statements made therein on information and belief are believed to be true, and all statements made therein are made with the knowledge that whoever, in any matter within the jurisdiction of the Patent and Trademark Office, knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be subject to the penalties set forth under 18 U.S.C. 1001, and that violations of this paragraph may jeopardize the validity of the application or document, or the validity or enforceability of any patent, trademark registration, or certificate resulting therefrom; and

(2) To the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that —

(i) The paper is not being presented for any improper purpose, such as to harass someone or to cause unnecessary delay or needless increase in the cost of prosecution before the Office;

(ii) The claims and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

10

DECLARATION OF JOHN R. THOMAS

1    (iii) The allegations and other factual contentions have evidentiary
2    support or, if specifically so identified, are likely to have
3    evidentiary support after a reasonable opportunity for further
4    investigation or discovery; and
5    (iv) The denials of factual contentions are warranted on the
6    evidence, or if specifically so identified, are reasonably based on a
7    lack of information or belief.

8    22.    In addition, the PTO has promulgated a specific provision directed
9    towards the duty of candor that applies to reexamination proceedings. *See* 37 C.F.R. §
10   1.555. At least one Court of Appeals decision has held that this obligation applies
11   equally to both the patent proprietor and the reexamination requestor. As stated in
12   *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440 (10th Cir. 1992):

13   We hold that the duty of candor and good faith in the reexamination
14   proceeding applies to both the requester and the patent defender, as well
15   as to their respective attorneys and agents. We emphasize that the duty
16   implicitly contains an element of intent: The duty applies when a
17   participant in the proceedings is aware, or becomes aware, of information
18   that is material to the PTO's determination of patentability. As the district
19   court noted, this duty includes an obligation to correct misrepresentations
20   to the PTO.

21   *Id.* at 1447.

22   23.    Violation of a practitioner's professional responsibilities towards the PTO
23   is termed "inequitable conduct." "Inequitable conduct occurs when a patentee
24   breaches his or her duty to the PTO of 'candor, good faith, and honesty'." *Warner-*
25   *Lambert Co. v. Teva Pharms. USA Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005) (quoting
26   *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)). The case law of
27   the Federal Circuit establishes a two-element standard for inequitable conduct. First,
28   the patent proprietor must have misrepresented or failed to disclose material

11

1   information to the PTO. Second, such nondisclosure or misrepresentation must have

2   been intentional. *See Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359 (Fed. Cir.

3   2007).

4       24.   The Federal Circuit has explained that a misrepresentation is material,

5   within the context of patent acquisition, if "a reasonable examiner would have

6   considered it important to the patentability of a claim." *Regents of the University of*

7   *Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1570 (Fed. Cir. 1997). As well, "affirmative

8   misrepresentations . . . in contrast to misleading omissions, are more likely to be

9   regarded as material." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309,

10  1318 (Fed. Cir. 2006) (citations omitted).

11      25.   With regard to the intent element of inequitable conduct, the Federal

12  Circuit has observed that courts seldom encounter direct evidence of an applicant's

13  intent to deceive. *Merck & Co. v. Danbury Pharm., Inc.*, 873 F.2d 1418 (Fed. Cir.

14  1989). "Such intent usually can only be found as a matter of inference from

15  circumstantial evidence." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 822 F.2d

16  1556 (Fed. Cir. 1989). A pattern of deliberately withholding or mischaracterizing

17  information is most probative of fraudulent intent, particularly if the individual

18  accused of inequitable conduct cannot provide a believable, good faith explanation for

19  its repeated conduct. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,

20  120 F.3d 1253 (Fed. Cir. 1997). Practitioners before the PTO must be and are aware

21  of these standards. I have reviewed the two Requests for Reexamination under these

22  established and well-known patent law standards in reaching my opinions.

23      26.   The Courts as Sole Arbiters of Fraud Before the PTO .

24      It should further be appreciated that the PTO does not investigate patent

25  applications for compliance with Rule 56. At one time, an internal unit of the PTO

26  informally known as the "Fraud Squad" would review applications for compliance

27  with the standard of inequitable conduct. *See* Harry F. Manbeck, Jr., *The Evolution*

28  *and Issue of New Rule 56*, 20 Am. Intell. Prop. Q.J. 136, 139 (1992). However, the

1　USPTO issued a Notice in 1988 announcing that it would no longer investigate and

2　reject patent applications under Rule 56.  PTO Notice Regarding Implementation of 37

3　C.F.R. § 1.56, 1095 Off. Gaz. Pat. <u>OFFICE</u> 16 (Sept. 8, 1988). *See Nilssen v. Osram*

4　*Sylvania, Inc.*, 440 F. Supp. 2d 884, 898 (N.D. Ill. 2006) (explaining that the USPTO

5　at one time reviewed patent applications for compliance with Rule 56, but has since

6　ceased to do so); MPEP § 2010 ("the Office does not investigate and reject original or

7　reissue applications under [Rule 56].")  As a result of PTO relinquishment of its

8　enforcement authority, the courts have become the sole arbiter of inequitable conduct

9　issues. *See Tafas v. Doll*, 559 F.3d 1345, 1358 (Fed. Cir. 2009), *vacated on other*

10　*grounds*, 328 Fed. Appx. 658 (Fed. Cir. 2009) ("The reach of inequitable conduct is

11　solely within the control of the courts . . . .").  Practitioners before the PTO should be

12　and are aware of the fact that the PTO itself does not have the ability to investigate

13　fraud or inequitable conduct itself but rather that the integrity of the PTO's processes

14　are enforced by private litigants in court.

15　　　　27.　　The Duty of Candor and Good Faith Applicable to Reexamination

16　　　　　　　Proceedings.

17　　　　As applied to reexamination proceedings, the duty of candor and good faith

18　requires practitioners to present only non-cumulative, prior art patents and printed

19　publications that individually, or in combination, establish a *prima facie* case of

20　novelty, non-obviousness, or another ground of patentability.  In particular, it is a

21　violation of the duty of candor and good faith to represent that a prior art reference

22　discloses elements that correspond to claim limitations in a patent subject to a

23　reexamination request, when in fact a person of ordinary skill in the art could not

24　locate that disclosure within the reference.  It is also a violation of the duty of candor

25　and good faith to misrepresent that the prior art asserted in a reexamination request is

26　more relevant than the prior art that the PTO previously considered.  Further, a

27　violation of the duty of candor and good faith occurs when an advocate represents that

28　a reference qualifies as prior art with respect to the patent subject to a reexamination

13

request, when in fact that reference in no way so qualifies. It is my experience that a patent examiner will rely on the fact that an attorney licensed to practice before the PTO is making a request for reexamination rather than a non-attorney. Attorney practitioners before the PTO must be and are aware of the duty of good faith and candor, and the PTO's reliance on that duty when considering requests for reexamination.

28. The Failure of the Requests for Reexamination of the '319 and '951 Patents to Satisfy the Duty of Candor.

In my professional opinion, the requests for reexamination of the '319 Patent and the '951 Patent fell far below the duty of candor and good faith required of Sheppard Mullin. In particular, Sheppard Mullin consistently misrepresented that the prior art references it brought before the PTO included technical features that corresponded to the limitations of the claims of the '319 and '951 Patents. Sheppard Mullin also misrepresented that the prior art it asserted was more relevant to the validity of the '319 and '951 Patents than prior art that was before the PTO, when in fact none of the asserted references was more relevant than U.S. Patent No. 4,359,631, which was before the PTO. Sheppard Mullin also misrepresented that the "Electronic Mall" reference qualified as prior art with respect to the '319 Patent, when in fact it did not so qualify.

29. Misrepresentations of the "Prior Art" in the Request for Reexamination of the '319 Patent.

I have reviewed U.S. Patent No. 6,289,319 (the '319 Patent) and the three primary references provided with the Request for Reexamination of that patent: "Comp-U-Store," "Globecom," and "Discount Store News." I have reviewed U.S. Patent No. 5,576,951 (the '951 Patent) and the five references provided with the request for reexamination of that patent: "Comp-U-Store," "Globecom," "Discount Store News," "Forbes," and "Kleinberg." I have further reviewed the Declaration of Professor David G. Kay.

14

DECLARATION OF JOHN R. THOMAS

30.     In view of the Declaration of Professor Kay, I wish to stress that the sheer number of misrepresentations made in both Requests for Reexamination with respect to the teachings of the prior art is extraordinary.  To be sure, some elements of the claims of the '319 and '951 Patents can be found in the references advanced by Sheppard Mullin—although I observe that many of the common elements constitute standard components of any computer system, such as a central processing unit, video screen, and keyboard.   Yet the elements of the invention that allow for the automated commercial transactions contemplated by these two patents are simply absent from the asserted prior art, by any stretch of argument or imagination.

31.     It is my professional opinion that no reasonable practitioner could forthrightly assert that any one of the references asserted by Sheppard Mullin anticipated either the '319 or '951 Patents.  It is my opinion that the attorneys from Sheppard Mullin licensed to practice before the PTO did not make these numerous affirmative misrepresentations by accident or mistake.   The novelty requirement is a bedrock principle of patent law, known well even by novice practitioners.  Under the rule, in order to defeat the novelty of a claim under 35 U.S.C. § 102, a reference must teach each and every element of the claimed invention.  As explained by Professor Kay in a most exacting manner, not one of the asserted references is even close to fulfilling this requirement.  Put simply, the argument of Sheppard Mullin that any one of the asserted references anticipates even a single claim of the '319 or '951 Patents was an outrageous misstatement, not even close to being accurate.

32.     It is also my professional opinion that no reasonable practitioner could forthrightly assert that the claimed inventions of the '319 and 951 Patents would have been obvious in view of the references, and that the attorneys from Sheppard Mullin did not.  The argument advanced by Sheppard Mullin within its two Requests for Reexamination is that the references collectively taught all of the limitations of the challenged claims of the '319 and '951 Patents, and that it would have been obvious to a person of ordinary skill in the art to combine those elements.  As the Declaration of

15

DECLARATION OF JOHN R. THOMAS

1  Professor Kay explains, however, not all of the limitations of the claimed invention are

2  found within the asserted references.  As a result, this assertion is also facially

3  implausible, and simply beyond the ability of even a zealous advocate to make.

4       33.  I further observe that misrepresentations made by Sheppard Mullin

5  incorporated in the two requests for reexamination regarding the independent claims

6  of the '319 and '951 Patents would necessarily apply to the appropriate dependent

7  claims of those patents as well.  Under well-understood principles of patent law, a

8  dependent claim references an earlier claim, but then provides additional limitations

9  upon the scope of that claim.  35 U.S.C. § 112 (2006).  Dependent claims are

10  interpreted to include all of the limitations of the referenced claim as well as those that

11  are newly recited.  Misstatements with respect to an independent claim therefore

12  applied equally to any claims that were dependent upon it.

13       34.  In reaching this conclusion, I am well aware that patent lawyers may

14  appropriately assert aggressive arguments that further the positions of their clients

15  before the PTO.  But when these arguments are deliberately made in order to mislead

16  an examiner, they cross the line into fraud and inequitable conduct.  As recognized in

17  *Bristol Myers Squibb Co. v. Ben Venue Labs,* 90 F. Supp. 2d 522 (D.N.J. 2000), "[i]t is

18  worth noting that advocacy before the PTO is appropriate.  But, there is a line between

19  legitimate advocacy in accordance with the duty of candor, and advocacy that the

20  applicant surely knows has a propensity to mislead the examiner."

21       35.  The Status of the "Electronic Mall" Reference as Prior Art.

22       In addition to making repeated mischaracterizations of the teachings of the

23  asserted references, the Request for Reexamination of the '319 Patent filed by

24  Sheppard Mullin  also misleadingly asserts that the "Electronic Mall" reference

25  qualifies as prior art against the '319 Patent under 35 U.S.C. § 102(b).  In fact, as a

26  matter of rudimentary patent law, no legitimate argument can be made that the

27  "Electronic Mall" reference so qualifies.

28  / / /

16

DECLARATION OF JOHN R. THOMAS

36.     Section 102(b) of the Patent Act states that a "printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States" qualifies as potentially patent-defeating prior art.  The Request for Reexamination for the '319 Patent describes the "Electronic Mall" reference as "a users [sic] manual that CompuServer [sic] provided to merchants participating in the Electronic Mall program."  Request at 7.  It further states that "this manual is believed to be a 1986 version."  *Id.*

37.     An initial difficulty with the assertion is that the term "printed publication" is a term of art within the patent law, and the nomenclature is well known to practitioners before the PTO such as Sheppard Mullin.  The Federal Circuit has recently confirmed the longstanding principle that in order to qualify as a printed publication under § 102(b), a reference must be publicly accessible.  *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319 (Fed. Cir. 2009).  In particular, a "document is publicly accessible if it 'has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.'."  *Id.* at 1333 (citations omitted).  In the *Cordis* case, the Federal Circuit concluded that the distribution of a monograph to a limited number of entities, even without a legal obligation of confidentiality, did not rise to the level of a "printed publication." Id. at 1334-35.

38.     In view of this well-known and established standard, my professional opinion is that the "Electronic Mall" reference cannot plausibly qualify as a "printed publication" under §102(b).  The "Electronic Mall" reference was explicitly designated as "confidentiality and proprietary," was provided only to individual merchants that participated in a specific corporate program, and was issued only upon the condition it be returned upon the completion of that program.   Under these circumstances, the "Electronic Mall" reference utterly lacks the trait of public

17

1  accessibility that is essential to a finding that it qualifies as a "printed publication"
2  under 35 U.S.C. § 102(b). Rather, the only indication is that the "Electronic Mall"
3  reference was distributed in a confidential and proprietary manual—circumstances that
4  the patent law has long deemed to disqualify the reference as prior art. *See, e.g.,*
5  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1998).

6      39.    Worse yet, the "Electronic Mall" reference incontestably does not qualify
7  as prior art against the '319 Patent under § 102(b) because of its publication date. The
8  '319 Patent issued from a number of so-called "continuing applications." 35 U.S.C. §
9  120 (2006). These applications are sometimes called "continued" or "continuations".
10  Stated generally, continuing application practice allows an applicant to obtain
11  additional opportunities for examination at the U.S. Patent and Trademark Office
12  (PTO). By so doing, applicants may negotiate further with a patent examiner, amend
13  claims, submit new claims, and gain more time to prepare evidence to be submitted to
14  the USPTO in support of their applications. *See* John R. Thomas, Pharmaceutical
15  Patent Law 246 (2005).

16      40.    Several types of continuing applications exist. Two of these types are
17  "continuation" and "continuation-in-part" applications. A continuation application
18  discloses the same subject matter as the predecessor application. A continuation-in-
19  part application, or CIP, adds some additional subject matter to the predecessor
20  application. *See Transco Products Inc. v. Performance Contracting Inc.*, 38 F.3d 551,
21  555 (Fed. Cir. 1994).

22      Section 120 of the U.S. Patent Act imposes several technical requirements that
23  must be met with respect to continuing applications. First, the continuing application
24  must be filed prior to the patenting, abandonment, or termination of proceedings of the
25  predecessor application. Second, the predecessor application and continuation
26  application must have at least one inventor in common. Third, the continuation
27  application must expressly identify the predecessor application. Fourth, to be entitled
28  to the benefit of the filing date of the predecessor application, claims within the

18

DECLARATION OF JOHN R. THOMAS

1   continuing application must be fully supported by the technical disclosure found

2   within the predecessor application.  Claims that reference "new matter" found in the

3   continuing application, but not in the predecessor application, are entitled only to the

4   actual filing date of the continuing application.  As noted previously, such applications

5   are termed continuation-in-part or CIP applications.  *See* John R. Thomas,

6   Pharmaceutical Patent Law 246 (2005).  The standards governing continuing

7   applications form a fundamental part of patent practice, and were well-understood

8   among even entry-level patent practitioners at the time the two requests for

9   reexamination were filed.

10       41.   As noted, the '319 Patent issued from a series of continuing applications,

11   with the original application filed o May 24, 1984.  That application was followed by a

12   continuation-in-part application on January 24, 1986, and then by several continuation

13   applications.  In terms of §102(b), then, the '319 Patent is accorded a filing date of

14   May 24, 1984, or, to the extent new matter was added to the application, January 24,

15   1986.  As a result, to qualify as prior art under §102(b), a publication must quite

16   clearly have been published one year before the latest possible filing date—namely, by

17   January 24, 1985.

18       42.   As PTO-licensed patent attorneys, the lawyers of Sheppard Mullin plainly

19   knew that the assertion that the "Electronic Mall" is prior art applicable to the '319

20   Patent is entirely specious.  Further, this issue is not one of subtle law—determining

21   that a reference published in 1986 was not available as of January 24, 1985, is hardly a

22   difficult calculation.  It is not credible that this assertion resulted from ignorance or

23   negligence on behalf of these licensed patent lawyers, particularly in view of the

24   numerous other misrepresentations made in the two Requests for Reexamination.

25       43.   The portrayal of the "Electronic Mall" reference as a printed publication

26   that qualified as prior art should be viewed of the context of the other references

27   Sheppard Mullin presented to the PTO.  The "Electronic Mall" manual incorporates

28   approximately 150 pages of detailed information.  Absent the "Electronic Mall", the

19

DECLARATION OF JOHN R. THOMAS

1   references accompanying the Request for Reexamination of the '319 Patent—namely,

2   the "Comp-U-Store," "Globecom," and "Discount Store News" references—would

3   have collectively comprised a quite modest total of 14 pages.  Further, the disclosures

4   of these references are much more abstract than that of the "Electronic Mall" manual.

5   In my professional opinion, the "Electronic Mall" reference plainly formed the

6   centerpiece of Sheppard Mullin's case in its Request for Reexamination of the '319

7   Patent.  I also conclude that even in view of all the other misrepresentations included

8   in this reexamination request, the PTO would have been far less likely to grant the

9   request had the "Electronic Mall" reference not been included.

10       44.    The misleading assertions regarding the "Electronic Mall" nonetheless

11   impacted the PTO's decision to grant reexamination with respect to the '319 Patent.

12   The Order Granting Request for Ex Parte Reexamination of the '319 Patent

13   specifically refers to the "Electronic Mall" reference as raising a substantial new

14   question for patentability.  Plainly the PTO examiner relied upon Sheppard Mullin's

15   assertions in issuing this order.

16       45.    The Relationship Between the Asserted References and the Prior Art '631

17           Patent.

18       In its Request for Reexamination of the '319 Patent and Request for

19   Reexamination of the '951 Patent, Sheppard Mullin specifically asserted that the

20   references it advanced were more pertinent than what was before the PTO when the

21   patents issued.  I have reviewed U.S. Patent No. 4,359,631 (the "631 Patent"), which

22   was subsequently reissued and reexamined as U.S. Patent No. B1 Re. 32,115.  I have

23   also reviewed the Declaration of Professor Kay, which explains that the '631 Patent

24   was a more pertinent prior art reference than any of the references submitted in either

25   Request for Reexamination.

26       46.    In view of the findings of Professor Kay, it is also my professional

27   opinion that Sheppard Mullin misrepresented that its asserted references were more

28   pertinent to the patentability determinations of the '319 and '951 Patents.  The '631

1   Patent plainly incorporates more comprehensive and directed teachings with respect to

2   the subject matter of the '319 and '951 Patents than do any of the references identified

3   in the two Requests for Reexamination.  In my professional opinion, Sheppard Mullin

4   was obligated to review the prior art before the PTO when it chose to allow the '319

5   and '951 Patent to issue, and to ensure that any references identified in a Request for

6   Reexamination were of greater relevance to issues of patentability.  In particular,

7   Sheppard Mullin should have determined that any newly asserted prior art was not

8   cumulative to the prior art of record, that it identified prior art technologies that were

9   not known to the PTO, that it was more comprehensive in its teachings, or any other

10  factor that would negatively impact the validity of the '319 and '951 Patents.

11  Sheppard Mullin plainly failed successfully to do so in this case.

12          47.    Consequences of Misrepresentations of the References in the Request for

13                 Reexamination of the '951 Patent.

14          The pattern of misleading conduct evidenced in the two Requests for

15  Reexamination demonstrates that Sheppard Mullin was not merely ignorant or

16  negligent.  Rather, I cannot come to any other conclusion and there is no other rational

17  conclusion but that Sheppard Mullin expressly intended to deceive the PTO by making

18  a series of material misrepresentations.  In my professional opinion, Sheppard Mullin

19  attorneys took advantage of the trust the PTO reposed in them as licensed patent

20  lawyers to provide candid, forthright, and honest analysis of the prior art in order to

21  place a cloud on the title of the '319 and '951 Patents that would last for many years.

22          48.    In making these misrepresentations, Sheppard Mullin was well aware that

23  PTO examiners do not make a full or independent investigation of the facts relating to

24  the reexamination request.  Rather, a reasonable PTO examiner would have relied

25  upon the material misstatements of Sheppard Mullin in reaching his decision to issue

26  an order granting a request for reexamination.  The Patent Act requires the PTO to

27  determine whether a substantial new question of patentability exists within a short

28  time frame—a mere three months—from the date the request for reexamination was

21

1  filed.  35 U.S.C. § 303(a) (2006).  Additionally, examiners are instructed to "not

2  decide, and no statement should be made as to, whether the claims are rejected over

3  the patents and printed publications" in the order granting the request for

4  reexamination.  MPEP § 2246.  As two experienced patent attorneys recently

5  observed, "[t]here is a time lag between ordering reexam and the examiner's actual

6  consideration of the patentability of the claims over the prior art."  *See* Paul Morgan &

7  Bruce Stoner, *Reexamination vs. Litigation—Making Intelligent Decisions in*

8  *Challenging Patent Validity*, 86 J. Pat. & Trademark Off. Soc'y 441, 444 (2004)

9  (emphasis added).

10       49.     The time lag explains why "[h]istorically, the [PTO] has found a

11  substantial new question in almost every ex parte request . . . ."  J. Steven Baughman,

12  *Reexamining Reexaminations:  A Fresh Look at the Ex Parte and Inter Partes*

13  *Mechanisms for Reviewing Issued Patents*, 89 J. Pat. & Trademark Off. Soc'y 349

14  (2007).  It was commonplace knowledge in the patent community that the USPTO

15  grants requests for ex parte reexamination at a rate of approximately 94%.  This PTO

16  policy is in part founded upon the agency's expectation of and reliance on honest and

17  forthright conduct from licensed patent practitioners.

18       50.     In this respect, the repetitive response of the PTO examiner in issuing

19  orders granting the requests for reexamination is worthy of note.  The examiner's

20  orders, which merely parroted language found in Sheppard Mullin's two requests,

21  further confirm that the PTO chose to grant reexamination based upon their misleading

22  assertions.  That the assertions of Sheppard Mullin were substantively meritless is

23  further evidenced by the fact that all challenged claims of the '319 and '951 Patents

24  were upheld fully intact following reexamination.

25       51.     It is also my professional opinion that absent the misrepresentations of

26  Sheppard Mullin, the PTO would not have initiated reexamination proceedings with

27  respect to the '319 and '951 Patents.  None of the references identified by Sheppard

28  Mullin was more pertinent to these patents than prior art already before the PTO

1  during their issuance. One of the references, the "Electronic Mall" manual, does not
2  even qualify as prior art under § 102. And the references, individually or collectively,
3  do not even form the basis of a plausible argument that either patent was invalid. I
4  therefore conclude that absent Sheppard Mullin's misrepresentations to the contrary,
5  the PTO simply would not have granted its request for reexamination.

6      52.    It is notorious within the patent community that reexaminations at the
7  PTO typically require many years to complete. The former Director of the PTO, Jon
8  Dudas, testified before the Senate Committee on the Judiciary that "a large number of
9  reexamination proceedings have been pending before the USPTO for more than four
10  years" and further questioned whether this lengthy period of time is consistent with the
11  statutory requirement that "[a]ll reexamination proceedings . . . will be conducted with
12  special dispatch within the Office". Perspectives on Patents: Hearing Before the
13  Subcomm. on Intellectual Prop, of the Senate Comm. on the Judiciary, 109th Cong.
14  (2005) (statement of Jon W. Dudas, Undersecretary of Commerce for Intellectual
15  Property, Director of the U.S. Patent and Trademark Office). As practitioners familiar
16  with the PTO Sheppard Mullin knew that by filing Requests for Reexamination that
17  persistently misrepresented fundamental facts, it could effectively suppress the '319
18  and '951 Patents through a lengthy and costly administrative proceeding.

19      53.    <u>Consequences of the Reexaminations of the '319 and '951 Patents.</u>

20      The consequences to the proprietor of any patent that is subject to unwarranted
21  reexamination proceedings can be severe. At a minimum, the patent proprietor must
22  devote significant resources towards defending the cloud that has been placed on the
23  title of the patent at the USPTO. As Senator Jon Kyl recently explained, merely to
24  mount a defense of one's patent in these proceedings "routinely costs a patent owner
25  hundreds of thousands of dollars in legal fees" and "many smaller companies,
26  universities, and others, when faced with these costs will simply abandon their patent
27  because they lack the money to defend themselves. In many cases simply granting
28  these proceedings is a death sentence for a patent." Senator Jon Kyl, Remarks at

23

        DECLARATION OF JOHN R. THOMAS

1    Executive Business Meeting of the Senate Judiciary Committee (March 31, 2009)

2    (available at http://judiciary.senate.gov/webcast/judiciary03312009-1000.ram).  It has

3    been my personal experience that reexamination proceedings are costly and can be a

4    financial catastrophe for a patent owner.

5        54.    In addition, patent proprietors generally find that patents subject to

6    reexamination are extremely difficult to exploit financially.  In particular, infringers

7    may be unwilling to accept a license of a patent that is under review at the USPTO.

8    Because a patent endures for only a limited number of years, the time lost during often

9    lengthy reexamination proceedings simply cannot be recovered.  This situation is

10   particularly true when industrial reliance upon a technology is growing, and the patent

11   proprietor would have found himself in a strong position to license its intellectual

12   property rights but for the pendency of reexamination proceeding.

13       55.    Conclusion.

14       It is not pleasant for anyone to conclude that licensed patent attorneys have

15   intended to deceive the PTO.  This charge is a serious one.  It holds significant

16   deleterious consequences for the individuals who have chose to walk this path.  It is

17   nonetheless my professional opinion that the repeated conduct of Sheppard Mullin

18   speaks for itself, readily falling into the category of fraud that the Federal Circuit has

19   condemned as an abuse of the patent acquisition system.  I therefore conclude that

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

24

DECLARATION OF JOHN R. THOMAS

1   Sheppard Mullin engaged in fraudulent and inequitable conduct while filing the

2   Reexamination Requests for the '319 Patent and '951 Patent.  The result was that the

3   owner of these patents was both deprived of his ability to benefit financially from

4   them, and also forced to direct considerable time and resources toward defending

5   them.

6           I declare under penalty of perjury under the laws of the State of California that

7   the foregoing is true and correct.

8           Executed this 21st day of October 2009, in Washington DC.

9

10

11                                          John R. Thomas

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOHN R. THOMAS