1 | HOWARTH & SMITH
2 | DON HOWARTH, State Bar No. 53783
   dhowarth@howarth-smith.com
3 | SUZELLE M. SMITH, State Bar No. 113992
   ssmith@howarth-smith.com
4 | KATHRYN LEE BOYD, State Bar No. 189496
   lboyd@howarth-smith.com
5 | 523 West Sixth Street, Suite 728
   Los Angeles, California 90014
6 | Telephone: (213) 955-9400
   Facsimile: (213) 622-0791

7 | Attorneys for Plaintiff
8 | LAWRENCE B. LOCKWOOD, PANIP, LLC

9 | UNITED STATES DISTRICT COURT

10 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

11 |

12 | LAWRENCE B. LOCKWOOD, PANIP, LLC,

13 | Plaintiffs,

14 |

15 | vs.

16 | SHEPPARD, MULLIN, RICHTER &HAMPTON, LLP, JONATHAN
17 | HANGARTNER, STEVE P. HASSID,

18 | Defendants.

19 |

20 |

CASE NO. CV09-5157 JFW (AGRx)

The Honorable John F. Walter
Ctrm: 16

**DECLARATION OF LAWRENCE B. LOCKWOOD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE**

Hearing Date: November 9, 2009
Time: 1:30 p.m.
Crtm: 16

21 | / / /
22 | / / /
23 | / / /
24 | / / /
25 | / / /
26 | / / /
27 | / / /
28 | / / /

DECLARATION OF LAWRENCE B. LOCKWOOD

1.   I am the inventor and owner of U.S. Patent Nos. 5,576,951 C1 (the "'951 Patent") entitled *Automated Sales and Services System* (attached hereto as Exhibit 1) and 6,289,319 C1 (the "'319 Patent") entitled *Automatic Business and Financial Transaction Processing System* (the "Patents") (attached hereto as Exhibit 2). Between 1985 and 1989, a decade before the Internet explosion, I was a featured speaker at eight national multimedia and financial services conferences, and published thirty multimedia technology and electronic commerce articles. I have received a dozen U.S. and foreign patents for my inventions in the fields of multimedia search systems, interactive video computing terminals, as well as E-commerce and computerized financial services (attached hereto as Exhibit 3). My patent family has been cited by the United States and Trademark Office (the "USPTO") as essential prior art in over 750 subsequently issued U.S. patents (attached hereto as Exhibit 4). The '951 Patent has been cited as prior art in over 150 subsequently issued U.S. Patents and examined by nearly 150 different examiners (attached hereto as Exhibit 5). In addition, my patents are highly cited by foreign patent offices, such as the European Patent Office (attached hereto as Exhibit 6). I have enforced some of my patent rights in *Lockwood v. American Airlines*, Inc., a case which was granted *certiorari* by the Supreme Court of the United States, and which is cited in the USPTO Patent Office Rules and Practice – Manual of Patent Examining Procedure ("MPEP") (attached hereto as Exhibit 7).

2.   In 1980, I filed my first patent application, *Self Service Terminal*, which issued as U.S. Patent No. 4,359,631 in 1982 (attached hereto as Exhibit 8). I filed my sixth patent application in 1984 for *Automatic Information, Goods and Services Dispensing System* that issued as U.S. Patent No. 4,567,359 in 1986 (attached hereto as Exhibit 9). That patent was the grandparent patent of the two patents for which Defendants requested reexamination in May of 2003. My '951 Patent, as originally issued by the USPTO, teaches a computer search system for retrieving information using textual and graphical entry paths. The patent also teaches a computerized

1  system for selecting and ordering a variety of information, goods and services. My

2  '319 Patent teaches an automatic data processing system for processing business and

3  financial transactions between entities from remote sites. The scope of my

4  inventions are defined by their claims. I applied for the '951 Patent and '319 Patent

5  in 1994, as continuations-in-part (CIP) of Serial No. 613,525, filed May 24, 1984;

6  and also as straight continuations (CON), i.e. identical, verbatim copies, of Serial No.

7  822,115, filed January 24, 1986, as stated on the face of both Patents. The '951

8  Patent issued in 1996, and the '319 Patent issued in 2001 after a unanimous decision

9  by three USPTO Administrative Patent Judges before the Board of Patent Appeals

10  and Interferences (the "BPAI"). The approximate costs to acquire both these patents

11  were in excess of $100,000.00.

12      3.    Between the years 1998 to 2000, I employed the accounting and

13  consulting firm of PricewaterhouseCoopers to perform licensing research in

14  connection with the '951 Patent. The cost was approximately $230,000.00. During

15  this period I also employed the law firm of Luce, Forward, Hamilton & Scripps to

16  perform an analysis of licensing strategies related to legal issues of patent

17  enforcement. The cost was approximately $300,000.00. During this period I also

18  employed the law firm of Lyon & Lyon to perform an analysis of licensing and the

19  claim scope of the '951 patent. The cost was approximately $274,000.00.

20      4.    The Patents were infringed by many computerized Business To

21  Business ("B2B") and Business To Consumer ("B2C") systems in the fields of

22  multimedia computer networking, database search and electronic commerce

23  technologies. As a result of the above professional analysis, in 2002, I licensed my

24  patents to my company PanIP, LLC ("PanIP"), which I registered with the Secretary

25  of State of California (attached hereto as Exhibit 10). I registered my PanIP

26  trademark with the USPTO, and a Notice of Allowance was issued as to the mark on

27  March 20, 2001 (attached hereto as Exhibit 11). I then initiated a program to license

28  and enforce the '951 and '319 patents by among other things filing infringement

2

DECLARATION OF LAWRENCE B. LOCKWOOD

1 | complaints in the District Court for the Southern District of California (the
2 | "Enforcement Program").

3 |     5.     I researched potential infringing company websites and reviewed their
4 | Dun & Bradstreet reports, which indicate the falsehood of Defendants' press
5 | statements that all the infringing companies were "mom & pop" businesses, since
6 | many of these companies had multi-million dollar retail sales (attached hereto as
7 | Exhibit 12). For example, in 2001, my licensee Electronic Express had retail sales of
8 | over $41,000,000.00 and my licensee Video Age had retail sales of $20,000,000.00.
9 | Another one of my 2002 licensees, Art.com, had 2001 on-line sales of
10 | $10,000,000.00, and since then, has sold over a half-billion dollars of art products
11 | throughout the world, using on-line technology. In 2008 alone, licensee Art.com had
12 | over $155,000,000.00 of on-line sales and is one of the 100 largest E-Commerce
13 | companies in the United States (attached hereto as Exhibit 13).

14 |     6.     Initially, the licensing program was very successful. During the first
15 | year of the Enforcement Program, multiple patent infringement complaints were filed
16 | against infringing companies. By mid-May 2003, I had entered into licensing
17 | relationships with over twenty-five companies, headquartered in fifteen different
18 | states, and was in negotiations with many other companies (attached hereto as
19 | Exhibit 14 is a list of Panip licenses subject to confidentiality clauses to be disclosed
20 | at such time this Court enters the Protective Order pursuant to the joint Stipulation
21 | Re: Confidentiality of Documents and Information, filed October 5, 2009).

22 |     7.     Defendant Jonathan Hangartner was a patent attorney at the law firm of
23 | Liu & Liu in San Diego, California. In March of 2002, PanIP filed patent
24 | infringement complaints against ten e-commerce companies. Hangartner represented
25 | four of the defendants: Snow Country Ski Shop, Inc., Peekay Corporation, Dickson
26 | Supply Co., and Backcountry Experience, Inc. Defendant Hangartner instigated the
27 | creation of a website entitled "Panip Defendants", at URL
28 | www.PanipCase.Homeip.net (attached hereto as Exhibit 15), and was responsible for

3

1  instigating false and misleading articles in newspapers and magazines about the

2  scope and validity of my Patents (attached hereto as Exhibit 16).  The website was in

3  operation between May 25, 2002 and September 23, 2002 (attached hereto as Exhibit

4  17).  Defendant Hangartner's picture and his contact information at Liu & Liu were

5  prominently featured under the "Defendants" link of the website. *See* Ex. 15.

6  Hangartner's four clients licensed the PanIP patent portfolio on October 28, 2002.

7  *See* Ex.14.

8      8.      As a result of Defendant Hangartner's campaign of false information to

9  the public via the press stories, there was a cyber-attack on my website.  I had

10  established my PanIP website in November of 2001, www.panip.com (attached

11  hereto as Exhibit 18).  During the week of May 13, 2002, a cyber-attack was

12  launched against the PanIP website by members of the online discussion site

13  Slashdot.org ("Slashdot"), who were misled by the Defendants' false and misleading

14  press campaign.  The Internet instructions posted by members of Slashdot explained

15  how to disable the PanIP website, noting that this was the way to put PanIP out of

16  business – "they pay for their bandwidth, and won't have any money left for their

17  lawsuits" (attached hereto as Exhibit 19).  The effect was that PanIP's website

18  crashed and a charge issued to PanIP by its host, Verio, of over $5,000.00 for the

19  week-long attack because of excessive bandwidth (attached hereto as Exhibit 20).

20  The hackers set up computer programs that flooded or "looped" the PanIP website.

21  Hundreds of vile messages were generated from the public, who relied on the false

22  statements of Hangartner and his clients, including death threats (attached hereto as

23  Exhibit 21).  In view of the computer hackers which resulted from Hangartner's

24  negative media campaign, I believed it was futile to maintain a presence on the

25  Internet to promote my business; and therefore, I shut down the PanIP website until

26  November 2002.

27      9.      I then filed patent infringement complaints against several e-commerce

28  companies between early September and early October 2002.  Again, Hangartner

4

1  contacted several of these defendants and organized them into the PanIP Group

2  Defense Fund, Inc. ("PGDF") enterprise following the same pattern of the earlier

3  "Panip Defendants" website, by creating a replica website with the URL

4  www.panipdefendants.org (attached hereto as Exhibit 22). This site was taken down

5  upon receipt of a cease-and-desist letter from my attorney and replaced by

6  www.YouMayBeNext.com (attached hereto as Exhibit 23).

7       10.    PGDF was an Indiana corporate entity and/or association-in-fact

8  (attached hereto as Exhibit 24), masterminded by Hangartner on October 29, 2002

9  (attached hereto as Exhibit 25), and commissioned, operated and managed by

10  Sheppard, Mullin, Richter & Hampton, LLP ("Sheppard Mullin") from November

11  29, 2002 to December 5, 2006.

12       11.    By October 2002, Hangartner had left the Liu & Liu law firm and joined

13  Sheppard Mullin. Between November 29, 2002 and December 5, 2006, Hangartner's

14  picture and/or contact information at Sheppard Mullin was prominently featured on

15  the PGDF website (attached hereto as Exhibit 26). Hangartner's profile page on the

16  Sheppard Mullin website highlighted his role as lead counsel for the PGDF (attached

17  hereto as Exhibit 27). Defendant Hangartner was promoted to partner at Sheppard

18  Mullin by February 8, 2005 (attached hereto as Exhibit 28).

19       12.    The benefits for the PGDF, as a result of their negative media campaign,

20  supported by members of Slashdot, to divert legitimate license income from PanIP to

21  themselves, was evidenced by their following statements in November 2002, "GOOD

22  NEWS. Yesterday's post on Slashdot got us thousands of hits on the [PGDF] web

23  site including many contributions. I'm still working diligently to convince some of

24  the [PanIP] defendants to join the Group Defense. I certainly don't understand why

25  defendants would give PanIP money to sue others. Their money is either going to

26  help PanIP or it can help us stop PanIP" (attached hereto as Exhibit 29).

27       13.    At a conference held on December 4, 2002 in Los Angeles, California,

28  Defendant Hangartner is quoted as stating to the audience of Internet pornographers

5

1  how to defeat patent enforcement against the adult entertainment industry,

2  "Hangartner advised the adult industry to enlist the court of public opinion with a

3  website similar to the YouMayBeNext.com site the firm [Sheppard, Mullin, Richter

4  & Hampton] commissioned for the PanIP suit" (attached hereto as Exhibit 30).

5      14.   Hangartner's stated modus operandi required the commissioning of an

6  enterprise, as evidenced by his statement that "You need a leader who is willing to

7  organize the group and keep it together."  Accordingly, in both the first group of

8  Hangartner's defendants with the web site of PanipCase.Homeip.net and his second

9  set of defendants with the web site YouMayBeNext.com, he was able to direct the

10  'leader to organize' and solicit new defendants for him and his firm to attract new

11  clients, under the auspices of a crusade to defeat patent holders with dubious and

12  valueless patents (attached hereto as Exhibit 31).

13      15.   Part of the PGDF strategy employed an Internet website entitled

14  YouMayBeNext.com.  The PGDF website and their statements in the press explicitly

15  stated that the PGDF purpose was to "put this guy [me] out of business" (attached

16  hereto as Exhibit 32), and to "Stop" my licensing program. *See* Ex. 23.  Again,

17  Defendant Hangartner was prominently featured on the website with a color picture

18  and his contact information at the law firm of Sheppard Mullin. *See* Ex. 26.

19      16.   Hangartner and Sheppard Mullin exhorted visitors to the PGDF website

20  to make payments to them with "PayPal - It's fast, free and secure!" and stated that

21  "checks may be sent to PanIP Group Defense Fund, Inc, 10105 Auburn Park Drive,

22  Fort Wayne, IN 46825 - Please make check payable to: PanIP Group Defense Fund,

23  Inc.  Your contributions will be used for the following: -All legal and administrative

24  costs involved in setting up PanIP Group Defense Fund, Inc.  -All legal and

25  associated costs involved with the PanIP Group Defense" (attached hereto as Exhibit

26  33).  Throughout years of the PGDF press stories and their web site activity, they

27  thanked the many who had contributed.  When a person sent money to the PGDF,

28  they replied, "Thanks for your contribution.  If everyone can just do a little

6

1  something, we can get this exposed to all the thousands of potential victims.

2  Everyone who sees this has the same reaction 'disgust'. We're in a position to fight

3  them and stop them now before they get momentum through precedent. Then

4  everyone will be at their mercy and it could take millions to stop them" (attached

5  hereto as Exhibit 34).

6        17.    With knowledge that their statements were false, the website as well as

7  the press articles instigated by Hangartner and PGDF stated that I was "running a

8  scam" (*see* Ex. 25), "going to sting hundreds of other businesses" (attached hereto as

9  Exhibit 35), committing "blackmail" (attached hereto as Exhibit 36) and committing

10  "extortion." *See* Ex. 25 and 27. They made specific published statements that their

11  goal was to "Stop PanIP" (*see, e.g.*, Ex. 33), and "We want to put this guy [me] out of

12  business" (*see* Ex. 32), and later published that they "...have successfully stopped

13  PanIP's strategy" (attached hereto as Exhibit 37). Hangartner and the PGDF made

14  the following false statements about my Patents, their validity and my legal

15  enforcement of the Patents, among others, on their PGDF website and in the press in

16  order to generate more business for themselves and to further their fraudulent

17  scheme:

18        a.    *San Diego Business Journal* - "Smaller Firms Become Targets in Patent

19  Litigation" - December 2, 2002 - "Any Web site with text, graphics and the ability to

20  collect financial information from consumers qualifies as an infringer, Hangartner

21  said" (attached hereto as Exhibit 38).

22        b.    *The Green Sheet Online* - "Nightmare on E-commerce Street" June 2,

23  2002 - "We believe this is a frivolous case... There are no merits to this case. We

24  believe the patent does not cover any form of e-commerce... I believe all companies

25  who do business on the Internet are vulnerable to this type of frivolous litigation.

26  Anybody with a Web site is vulnerable to being sued by PanIP, but not what is in this

27  particular complaint. .. If they prevail, they very well could go after everyone in the

28  e-commerce chain... This guy [me] would be entitled to set up licensing agreements

7

1  with every e-commerce provider in the world who offers their business in the United

2  States," said Hangartner. *See* Ex. 32.

3       c.    *YouMayBeNext.com* - "They claim that if you use graphical and textual

4  information on a video screen for purposes of making a sale, then you are infringing

5  on their patent. US Patent No 5,576,951. And if you accept information to conduct

6  automatic financial transactions via a telephone line & video screen, you're

7  infringing on their patent. US Patent No. 6,289,319". *See* Ex. 23.

8       d.    *Internet Retailer.com* -"E-Retailing's Latest Hazard: Patent Lawsuits" -

9  November 2002 -"Hangartner says the claim covers any web site that contains texts

10  and graphics and that is capable of obtaining financial information, whether in an

11  automated format or not" (attached hereto as Exhibit 39).

12       18.    The PGDF website also stated that, "We've been greatly encouraged by

13  all who are sending in contributions. Obviously it increases our resources to have

14  others contributing to our fight, but is also gives us a mental boost to know that

15  people appreciate the stand we are taking. We sincerely thank you for supporting our

16  efforts to stop PanIP from suing other e-commerce site owners." *See* Ex. 36.

17       19.    The YouMayBeNext.com website was using PanIP's registered

18  trademark "PANIP" as a metatag to divert Internet traffic from PanIP's own website;

19  was encouraging others to link to the youmaybenext.com website via logos which

20  incorporated the tradename "PanIP"; and was advertising the PanIP Group Defense

21  Fund, Inc., which used the "PANIP" mark as the first word of its corporate name.

22  Therefore, in response to the false statements made on their website and in the press,

23  and in order to protect my business reputation and PanIP's registered trademark, on

24  November 4, 2002, I filed a complaint in the U.S. District Court for the Southern

25  District of California against the PGDF, et al., alleging federal and state trademark

26  infringement, federal and state unfair competition, federal cybersquatting, and

27  defamation, *PanIP LLC, et al v. PanIP Group Defense Fund, et al.* (the "PDGF

28  case"). On November 26, 2002, defendants in the PGDF case filed a motion to

8

1    dismiss for lack of personal jurisdiction, to dismiss for improper venue and/or to

2    strike the complaint pursuant to California Code of Civil Procedure §425.16

3    (attached hereto as Exhibit 40).

4         20.    On January 16, 2003, the court ruled in my favor, denying the PGDF

5    defendants' motion to dismiss.  While the motion to strike was granted as to the

6    pendant state law claims based on the PGDF defendants' claims to immunity under

7    the Communications Decency Act of 1996 (47 U.S.C. 230 §§ et seq.), the court

8    ruled in my favor as to the federal claims, finding the anti-SLAPP Statute to be

9    inapplicable to federal claims. *See* Ex. 40 at 441-442.  Subsequently, both I and the

10   PGDF defendants filed cross-motions seeking attorneys' fees and costs pursuant to

11   Cal. Code Civ. P. §425.16(c).  The PGDF defendants were granted a total of

12   $22,973.43 for attorneys' fees and costs and the court also awarded me attorneys' fees

13   and costs in the amount of $3,900.00, finding that "the portion of the [PGDF

14   defendants' anti-SLAPP] motion pertaining to the federal claims was clearly

15   frivolous".  The award to the PGDF defendants was thus offset by my award, with

16   the result that I owed the PGDF defendants a total sum of $19,073.43. *See id.*

17        21.    On May 5, 2003, Defendants mailed by U.S. Postal Service to the

18   USPTO two ex parte reexamination requests signed by Defendant Hassid, as an

19   attorney at Sheppard Mullin, who was registered to practice before the USPTO, and

20   on behalf of the PGDF, which were based on fraudulent and misleading

21   representations about claimed prior art references (the "Requests") (attached hereto

22   as Exhibits 41 ('951) and 42 ('319)).  They mailed their Requests by two different

23   U.S. Postal Service Express Mail orders, numbers 727,855,784 and 727,855,798.

24   *See id.* at 450 and 467.  Additionally, the two Requests were mailed by the U.S.

25   Postal Service to my patent law firm, Charmasson & Buchaca.  I also received

26   copies, mailed to my home address, by the U.S. Postal Service (attached hereto as

27   Exhibit 43).

28   / / /

9

22.     Although the Markman hearing to determine the claim construction and scope of my Patents was scheduled to begin one month later on June 3, 2003, the Defendants subjected me to a lengthy and expensive reexamination of my Patents, after I had spent years engaged in the arduous and costly process of originally obtaining the patents.  If I had not undertaken an expensive and time-consuming defense of my Patents in reexamination, they would have been invalidated by default, which would have been the death knell for my intellectual property, as the Defendants knew well.

23.     Hangartner stated in the press that he had hired Nuvocom, a leading prior art research firm that specialized in electronic commerce industry history, to locate examples of early electronic sales systems in order to demonstrate that my Patents had been improvidently granted by the USPTO.  *See* Ex.  31.

24.     Under the USPTO rules, I could not challenge their Requests or take any official action with the USPTO until after the USPTO made its determination whether to grant or deny their Requests for Reexamination.  At the time of the requests, I relied on the duty of candor requiring patent practitioners to provide only truthful statements or conclusions about prior art references submitted in reexamination requests.

25.     Sheppard Mullin, along with and in coordination with Hassid and Hangartner, on May 5, 2003, the same day the Requests were filed, filed a Motion to Stay Litigation in the Enforcement Proceedings before Judge Rudi M.  Brewster of the District Court for the Southern District of California (attached hereto as Exhibit 44), which Motion was based solely upon the fraudulent Requests.  Hangartner signed a Declaration in Support thereof and in which he falsely stated:

a.      "The PanIP Group Defense Fund, Inc., a group made up of sixteen defendants in this and three other related patent cases, has identified extensive, published prior art dating to the early 1980's that unequivocally anticipated the

/ / /

09:P2275332.doc                                    DECLARATION OF LAWRENCE B. LOCKWOOD

alleged inventions in both U.S. Patent Nos. 5,576,951 (the '951 Patent) and 6,289,319 (the '319 Patent)."

b.     "These requests seek reexamination of the '951 and '319 Patents based on prior art references that clearly anticipate and/or render obvious all the elements of independent claims 1 through 10 of the '951 Patent and independent claim 1 of the '319 Patent."

c.     "In addition, the requests seek reexamination of dependent claims 2-4 and 6-9 of the '951 Patent and claims 2-6 [sic (3-6)] of the '319 Patent based on anticipation and/or obviousness."

d.     "These requests for reexamination are all based on published prior art references that were not considered by the examiner during prosecution of the '951 and '319 Patents."

e.     "None of this prior art was identified or considered during prosecution of the patents."

f.     "It is likely that reexamination will result in a determination by the USPTO that the patents-in-suit are invalid."

g.     "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge."

26.     In support of their scheme to defraud the USPTO and to harm me, Sheppard Mullin, in coordination with Hassid and Hangartner, on May 6, 2003, after the Requests had been filed, and in support of their Motion to Stay Litigation in the Enforcement Proceedings before the District Court for the Southern District of California, mailed a letter, by U.S. Postal Service and by fax, to Magistrate Judge James F. Stiven (attached hereto as Exhibit 45) which stated:

a.     "PGDF's reexamination requests are based on multiple prior art references that were not in the record during prosecution of these patents. These references predate the earliest patent applications filed by Mr. Lockwood, and clearly

/ / /

11

1    anticipate and/or render obvious the inventions allegedly represented in the '951 and

2    '319 Patents."

3        b.    "Defendants have identified prior art that they firmly believe renders

4    Plaintiffs patents invalid and they have invoked a procedure to test that belief before

5    the U.S. PTO. [sic]" "Further, since the reexamination of the patents will be an ex

6    parte proceeding they have no incentive to settle this case pending a decision on their

7    motion to stay".

8        A copy of the May 6, 2003 letter to Magistrate Judge James F. Stiven was also

9    faxed to my attorney Kathleen M. Walker. *See* Ex. 45.

10   27.    My attorney, Kathleen M. Walker, was mailed a copy of the Motion to

11   Stay on May 7, 2003 from the San Diego Office of Sheppard, Mullin by the U.S.

12   Postal Service (attached hereto as Exhibit 46).

13   28.    The U.S. District Court, Judge Rudi M. Brewster, Magistrate Judge

14   James F. Stiven, my attorney Kathleen M. Walker and I relied upon the truthfulness

15   of the requests and on June 2, 2003 agreed to a limited stay, of less than sixty days,

16   until the decision of the USPTO to either grant or deny the requests to reexamine.

17   Everyone relied and acted upon the belief that the requests for reexamination were

18   truthful, when in fact it was later discovered they were based on fraud. Furthermore,

19   Hangartner had filed his motion to stay with the U.S District Court on the same day

20   the Requests were filed.

21   29.    As a result of Defendants' deceitful statements and reliance on the

22   Requests, I stipulated to the limited stay. As a result, the Enforcement Proceedings

23   were stayed pending the resolution of the reexaminations of the Patents unlawfully

24   instigated by Sheppard Mullin, Hangartner and Hassid. The limited stay of less than

25   three months until a decision by the USPTO, and the subsequent USPTO decision to

26   grant their requests to reexamine my patents, had the intended effect of destroying

27   my ability to use or derive any benefit from my valid Patents for the four years the

28   / / /

DECLARATION OF LAWRENCE B. LOCKWOOD

1   reexaminations were pending and for an additional one year period required to restart

2   my licensing program.

3         30.    On May 16, 2003, the Defendants' intention to deprive me, via their

4   fraud on the USPTO, of the opportunity to enforce my valid property rights in the

5   Patents was further evidenced by their statements in a letter, which was similarly

6   mailed by U.S. Postal Service and faxed to the Magistrate Judge James F. Stiven of

7   the U.S. District Court for the Southern District of California: "Here, both patents

8   have been challenged based on anticipation under 35 U.S.C. § 102(b) and

9   obviousness under 35 U.S.C. § 103. The requests are based on numerous prior art

10  references dating to the early 1980's, before the filing date of the earliest patents in

11  the family of patents that includes the patents in suit. U.S. Patent No. 6,289,319 (the

12  '319 Patent) is challenged *based on ten separate references*, none of which was in the

13  record during examination of the '319 Patent. U.S. Patent No. 5,576,951 (the '951

14  Patent) is challenged *based on five separate references*, none of which was in the

15  record during examination of the '951 Patent. These reference [sic] clearly anticipate

16  every element of the claimed inventions in both the'319 and '951 Patents" [italics in

17  original] (attached hereto as Exhibit 47). A copy of this letter was also faxed to my

18  attorney Kathleen M. Walker. In reliance on Defendants' deceptive

19  mischaracterization of about 350 pages of a dozen alleged prior art references

20  submitted by them in their Requests for reexamination, the USPTO did grant their

21  Requests in July 2003, which had the intended effect of stopping my Enforcement

22  Program, causing me great economic loss and the loss of business relationships in the

23  form of targeted licensors and the use of my Patents for over four years of the

24  seventeen-year life of the Patents.

25        31.    After receiving copies of the two Requests for reexamination at my

26  residence, I met with my patent attorney Henri J. A. Charmasson on May 7, 2003 to

27  discuss how to proceed. I understood that by law, I would not have the opportunity

28  to make any rebuttal or otherwise file any statement with the USPTO until after the

13

1   decision had been made and a determination to grant or deny the Requests for

2   reexamination as per 37 C.F.R. §1.530(a).  Further, I understood that if the decision

3   granted the Requests and initiated reexamination, an examiner would then conduct

4   his own prior art search, and might combine the prior art submitted with the Requests

5   with prior art he located as a result of his search.  Therefore, I was under the

6   understanding that it would not be of any value to conduct an examination of the

7   prior art, until the examiner had issued a First Office Action on the merits.  At that

8   time, Mr. Charmasson explained, we would be in a position to address all the

9   relevant facts.  My attorney informed me that until the examiner has completed his

10  domestic and international search, it would be impossible to know the importance of

11  Sheppard, Mullin's prior art and how it may be combined with newly discovered

12  prior art.  Further, Mr. Charmasson explained that reexaminations have a special

13  status and we that should expect a First Office Action in a timely manner.  Based on

14  his advice, I decided to wait until the First Office Action for each reexamination

15  before devoting the necessary time, money and resources to review the Sheppard,

16  Mullin prior art references.  Mr. Charmasson and I relied upon Defendants' duty of

17  candor as patent practitioners in their requests for reexamination and had no reason

18  to suspect they had falsified requests to the USPTO.  Also, I consulted MPEP

19  Section 2260 Office Actions which states; "On taking up an application for

20  examination or a patent in a reexamination proceeding, the examiner shall make a

21  thorough study…of the available prior art…"  (3) An international-type search will

22  be made in all national applications filed on and after June 1, 1978."  MPEP Section

23  2261 Special Status for Action states; "In view of the requirement for 'special

24  dispatch' reexamination proceedings will be 'special' throughout their pendency in

25  the Office.  The examiner's first action on the merits should be completed within *1*

26  *month* of the filing date…37 C.F.R. §1.535.  [Italics in original]

27       32.    After filing their Requests, Defendants then used that July 2003 USPTO

28  decision to justify their false statements in the press that my Patents and licensing

14

1  program were without merit, as evidenced by Hangartner's boast that, "The Patent

2  Office has rejected the 10 claims that we challenged. That means that if that

3  rejection holds throughout the process, that result will be the patent itself is invalid...

4  However, overcoming the initial findings will be very difficult for PanIP. The Office

5  Action is very will reasoned and strong" (attached hereto as Exhibit 48).

6        33.    On August 15, 2003, the PGDF enterprise boasted on

7  YouMayBeNext.com: "First, through the support of the public and the help of a

8  private prior art search firm, we have found substantial evidence undermining the

9  Patents. In May we used this evidence to file requests with the U.S. Patent and

10  Trademark Office ("PTO") to reexamine and invalidate both of them. At the same

11  time we moved to stay PanIP's lawsuits, and in June the federal court in San Diego

12  issued an order staying the cases to allow our reexamination requests to be

13  considered. In July, we received notice that the PTO has accepted our request for

14  reexamination and agrees that we have raised "a substantial new question of

15  patentability" as to the claims of the first of PanIP's patents. Second, we have

16  obtained an award of attorney's fees against PanIP for approximately $19,000.00

17  related to the defense of PanIP's unsupported lawsuit alleging defamation and

18  trademark infringement against the PanIP Group Defense Fund... Third, **we have**

19  **successfully stopped PanIP's strategy**..." [Bold in original] *See* Ex. 37.

20        34.    As a result of the USPTO's decision to grant the Requests for

21  reexamination, all my licensing revenue effectively ended. Because of the likelihood

22  of invalidity of the Patents' based on "a substantial new question of patentability"

23  being reviewed in the reexamination proceedings, many potential licensees stated

24  that they would not pay licensing fees or even discuss licensing until reexamination

25  terminated (attached hereto as Exhibit 49), as evidenced by the following examples:

26        a.    Edward M. Keating, attorney for ASC, Inc. – May 5, 2004 – "I have

27  reviewed the reexamination proceedings of your U.S. Patent Nos. 5,576,951 and

28  6,282,319 [sic]. The prior art cited in these reexamination proceedings has led me to

DECLARATION OF LAWRENCE B. LOCKWOOD

1    question whether or not your patents will emerge from the reexamination procedure

2    with claims that will cover what my client is doing.  Therefore, I have advised my

3    client not to accept your offer of a covenant not to sue under these patents at this

4    time.  When your patents emerge from reexamination, my client would be glad to

5    reconsider your offer."

6        b.      Intellectual Property Law Group, LLP, attorneys for Mr.  Gene

7    Sheppard – February 9, 2004 – "Please be informed that Mr. Sheppard has decided to

8    decline the offer to enter into a license agreement with your client, PanIP, LLC.

9    Given that the two U.S. Patents at issue (U.S. Pat.  Nos. 5,576,951 and 6,289,319)

10   are currently the subject of reexamination proceedings with the United States Patent

11   and Trademark Office, we are hesitant to enter into a license agreement with PanIP."

12       c.      J.  H. Breakell & Co.  – April 1, 2004 – "I think that is would be prudent

13   to wait until the re-examination process is completed."

14       d.      David M. Balabanian, attorney for Liberty Orchards Company, Inc.  –

15   April 14, 2004 – "We also understand that one or both of those patents are currently

16   in reexamination.  If that is the case, it would appear premature to be discussing their

17   enforcement until the question of their validity and scope has been determined."

18       e.      David W. Sar, attorney for Replacements Ltd.  – February 12, 2004 –

19   "Your letter further concedes that your client's patent(s) are being reexamined by the

20   Patent Office.  Your letter also states that because of the reexamination, the patent

21   litigation in which your client is involved has been stayed.  No doubt, any future

22   litigation your client might initiate over the same patent(s) will also be stayed.  It

23   therefore makes sense and is the most economical for everyone that consideration of

24   your client's allegations, as well as any potential discussions thereof, should likewise

25   be delayed until the reexamination proceedings conclude."

26       f.      PHD Pharmaceuticals – April 12, 2004 – "We are offering $1,200.00 to

27   settle this matter without litigation.  Should this offer not be expected [sic], we will

28   wait for the reexamination of the patents from the patent office.  We have been

1  notified that after reexamination the patents will most likely be greatly changed if not
2  invalidated."

3  These responses are representative of the refusals to license I received because
4  of the reexaminations of my Patents. I received through my attorney, Kathleen M.
5  Walker, similar refusals in telephone conversations with potential licensees. At this
6  point, the Defendants had accomplished their goal of "putting this guy [me] out of
7  business" by effectively ending my licensing program. *See* Ex. 32.

8  35.   On or about March 8, 2004 a settlement conference was held in the U.S.
9  District Court chambers of Magistrate Judge James F. Stiven attended by Hangartner
10  and one of his clients, my attorney Kathleen M. Walker and me. At the conference,
11  Hangartner explained to the Magistrate the importance of reexamination to the case,
12  that because of the dozen prior art references he had discovered, both patents would
13  be ruled invalid or their claims severely limited. Further, Hangartner told the
14  Magistrate the fact that the USPTO had agreed to reexamine both patents proved
15  there was a substantial new question of patentability and that his 16 clients would
16  never license these dubious and valueless patents. There had not even been a First
17  Office Action on either patent, so there was a cloud of uncertainty as to whether my
18  Patents would be found valid. At this point my PanIP licensing program had ceased.
19  I owed a mandatory SLAPP attorney fee award to the PGDF in the amount of
20  $19,073.43 and I faced the prospect of years of having to defend the patents before
21  the USPTO, which my patent attorney estimated would cost $100,000.00 in legal
22  expenses alone.

23  36.   To resolve the immediate financial problems created by Defendants and
24  PGDF, I was forced to dismiss the Enforcement Proceedings and executing a
25  Covenant Not to Sue and Release Agreement with the PGDF and the Defendants on
26  or about March 19, 2004. Hangartner and the PGDF demanded that in order to settle
27  their SLAPP award, I would be required to agree to restrictions and limitations on
28  my ability to license and enforce my Patents. These restrictions and limitations were

17

based on the fact that both my patents were in reexamination. The Agreement stated, "6.1 – PanIP and Lockwood warrant that during the pendency of the Patent Portfolio reexaminations currently underway that neither PanIP nor Lockwood will file any complaints alleging infringement of any patent that is in reexamination. Further, PanIP and Lockwood warrant that if they solicit any licensing agreements or covenants not to sue for alleged infringement of the Patent Portfolio during the period in which the Patent Portfolio is under reexamination, they will include a statement in such solicitations that the Patent Portfolio is currently under reexamination by the United States Patent and Trademark Office." *See* Declaration of Dennis J. Smith, ("Smith Decl."), Ex. A.

37.     Despite knowing the fraudulent, misleading and malicious content of the Requests, from May 2003 through December 5, 2006, Defendants continued to rely on the Requests in order to perpetrate the fraud through the PGDF enterprise and website. The Defendants continued to solicit funds from the general public until May 2004. According to www.Archive.org, Sheppard Mullin maintained a presence on the PGDF website, profiting from the enterprise, until at least December 5, 2006, and the PGDF website continued in operation until January 2008 (attached hereto as Exhibit 50).

38.     Prior to May 5, 2003, I developed a patent licensing program for the benefit of tax-exempt, non-profit organizations, e.g., museums and youth organizations. I was preparing to submit PanIP's request to the IRS for a "private letter ruling," which is a written statement issued to the taxpayer by the IRS in which interpretations of the tax law are made and applied to a specific set of facts. This licensing opportunity and the future licensing benefit to PanIP to be derived therefrom was lost due Sheppard Mullin, Hangartner and Hassid's fraudulent and unlawful conduct.

39.     Nevertheless, I continued to pursue revenue-generating prospects from my patents. I retained the law firm of Jones Day to assist me in actively working

18

1  with the Motion Picture Association of America (the "MPAA") and the Recording

2  Industry Association of America (the "RIAA") to assist in terminating or limiting

3  their multi-billion dollar loss from piracy of their motion pictures and music over the

4  Internet by eventual enforcement of the Patents.  Internet piracy utilized peer-to-peer

5  technology that, we believed, may have infringed the Patent portfolio.  During 2004,

6  I met with MPAA executives and their attorneys at the MPAA offices in Los Angeles

7  to develop a business strategy.  However, because of the unlawful conduct of filing

8  the malicious Requests, the MPAA and RIAA postponed further discussion until the

9  patents emerged from reexamination.  This potential multi-million dollar licensing

10  relationship, as well as other business relationships based on my Patents, was lost

11  due to the Defendants' fraudulent and unlawful conduct.  Despite my attorneys'

12  efforts, the use of my Patents in any capacity was foreclosed to me as long as the

13  reexamination process continued.

14      40.    On April 28, 2004, the First Office Action of the '951 Patent was

15  received (attached hereto as Exhibit 51), confirming and validating my

16  understanding that I should wait for a First Office Action, because the examiner had

17  located an entirely new prior art reference to base a rejection.  I now expected the

18  First Office Action for the '319 Patent to be received soon thereafter.  In fall of 2004,

19  my patent attorneys began contacting the USPTO to determine the status of the '319

20  Patent reexamination.  On May 5, 2005 the First Office Action for the '319 Patent

21  was mailed by the USPTO (attached hereto as Exhibit 52).  The examiner issued a

22  non-final rejection of the all claims, based solely on Sheppard Mullin's prior art and

23  no new references.  My patent attorneys, my assistant and I began an investigation of

24  those references that culminated in the July 17, 2005 amendment sent to the USPTO.

25  The investigation continued into the fall of 2005 with the ordering of the book How

26  to Get the Most Out of CompuServe, on September 1, 2005.  That book proved that

27  the Electronic Mall was only a proposed 'skeleton' system in 1984 and had been

28  totally misrepresented in Defendants' Request for reexamination of the '319 Patent

19

1  (attached hereto as Exhibit 53). Upon learning this information, I realized the scope

2  of the fraud perpetrated against USPTO, the District Court, PanIP, my attorneys, and

3  me.

4      41.    Defendants were on notice of all my statements to the USPTO, as they

5  had been served all amendments and responses to Office Actions, yet they failed to

6  meet their "continuing" Duty of Candor, taking no steps to rectify the fraudulent

7  statements and misrepresentations contained in their original Requests. The file

8  histories can be located online via the USPTO's "Public PAIR" (Patent Application

9  Information Retrieval) system by searching for application numbers 90/006623 (for

10  the reexamination file history of the '319 Patent) and 90/006625 (for the

11  reexamination file history of the '951 Patent) at

12  http://portal.uspto.gov/external/portal/pair.

13      42.    Despite Defendants' misrepresentations, once I was able to demonstrate

14  the correct state of the prior art, the reexamination proceedings terminated

15  completely in my favor. On July 17, 2007, the USPTO issued the Ex Parte

16  Reexamination Certificate for the '319 patent, which concluded the reexamination

17  and indicated that all original claims had been confirmed without any finding by the

18  USPTO that the references submitted by Defendants as prior art had amended or

19  invalidated the patent claims (attached hereto as Exhibit 54).  On January 29, 2008,

20  the USPTO issued the Ex Parte Reexamination Certificate for the '951 patent, which

21  concluded the reexamination and indicated that all original claims had been

22  confirmed without any finding that the references submitted by Defendants as prior

23  art had merited any amendment to, or cancellation of, the claims (attached hereto as

24  Exhibit 55).

25      43.    On December 18, 2006, one of my attorneys, Robert W. Dickerson of

26  Jones Day, met with Sheppard Mullin attorneys Ronald D. Ryland, Gary Clark and

27  Kent Raygor at the Los Angeles office of Jones Day to discuss the Defendants'

28  Requests for reexamination of the two Patents. At the conclusion of the meeting

09:P2275332.doc                                    DECLARATION OF LAWRENCE B. LOCKWOOD

1   during which the Defendants were put on notice of my claims against them, the
2   parties agreed to a tolling agreement that was signed on January 5, 2007. Defendants
3   again ignored their responsibilities in connection with having submitted the two
4   Requests for reexamination, and they failed to abide by the rules and regulations of
5   the USPTO and their duty of candor (attached hereto as Exhibit 56).

6        44.    After the December 18, 2006 meeting between Mr. Dickerson and
7   Defendants any trace, listing or contact information for Hangartner, who was a
8   partner at the firm, was removed from the Sheppard Mullin website between
9   December 23, 2006 and January 2, 2007 and Hangartner was no longer employed by
10  the firm.

11       45.    A second meeting was held at Mr. Dickerson's office with three
12  Sheppard Mullin attorneys, Ronald D. Ryland, Gary A. Clark and Gregory A. Long,
13  on April 17, 2007. Again, Mr. Dickerson explained the false statements and the
14  fraud perpetrated. Again, they ignored their responsibilities in connection with
15  having submitted the two Requests for reexamination, and they failed to abide by the
16  rules and regulations of the USPTO and their duty of candor. A sixty (60) day
17  extension, of the three-month tolling agreement, was agreed to by all parties.

18       46.    Before the tolling agreement expired, I filed a complaint based on the
19  same set of facts in the Complaint filed in this action in the Superior Court of the
20  State of California for the County of Los Angeles, against Sheppard, Mullin, Richter
21  & Hampton, LLP; Jonathan Hangartner; and Does 1 through 20, case no. BC
22  372160, on June 4, 2007. As a result of the Defendants' successful scheme to
23  destroy my business, and financially cripple me, I was compelled to file the
24  complaint pro se.

25       47.    After the four-year reexaminations finally terminated on January 29,
26  2008 with all my claims confirmed, I then began to restart my licensing program,
27  which took about one year. I interviewed law firms to represent and execute my
28  licensing strategies, and I conducted new market research and secured the necessary

21

1   financial resources. I selected the law firm of Jeffer, Mangels, Butler and Marmaro
2   ("JMBM") headquartered in Los Angeles, California. One of my reasons for
3   selecting JMBM was that this firm has had a successful patent enforcement
4   background representing other patent holders. To date, my new 2009 enforcement
5   program has successfully licensed: Canon U.S.A.; Walgreen Co.; Lowe's Cos.;
6   Kohl's, Corp.; Blue Nile, Inc.; The Finish Line, Inc.; Zale Corp.; Bidz.com Inc.;
7   Golfsmith International Holdings; Eddie Bauer, Inc. and Under Armour, Inc. for very
8   significant amounts of money. Negotiations with additional companies are ongoing.
9     The market capitalization of Canon U.S.A. is $50 billion, Walgreen Co. is $34
10  billion, Lowe's Cos. is $31 billion and Kohl's Corp. is $16 billion. Thus I have
11  successfully licensed or settled my patent portfolio to several multi-billion dollar
12  corporations represented by some of the largest law firms in the world.
13      48.    My Patents are under a continuing threat of a similar fraud being
14  perpetrated by Defendants, given that the U.S. Patent laws and the USPTO rules and
15  regulations allow multiple requests for reexaminations even based on the same prior
16  art references, and given that Defendants, through PGDF, have repeatedly made
17  statements that their goal is to put me out of business. More than fifty (50) press
18  articles have been initiated by their campaign to end my business. *See* Ex. 16.
19  Under the rules and regulations of the USPTO, they, at any time, may instigate
20  deceptive reexamination proceedings in order to prevent me from ever enforcing my
21  Patents. Requesters can submit multiple requests while a patent is in reexamination,
22  endlessly delaying a final decision by the USPTO as to the validity of the patent.
23      49.    I am also aware that Sheppard Mullin has continued to file requests for
24  reexamination before the USPTO as a litigation strategy against other patent holders,
25  despite the fact that when the USPTO conducts a thorough review of Sheppard
26  Mullins' requests, the USPTO has confirmed all claims of the challenged patents.
27  For example, on January 4, 2005, Sheppard Mullin filed reexamination request
28  90/007,366 seeking reexamination of U.S. Patent No. 6,517,935, and on February 25,

22

1   2005 the USPTO determined to grant the request.  Yet on October 24, 2006, the

2   USPTO confirmed the patentability of all the patent claims over the prior art

3   submitted by Sheppard Mullin.  Similarly, on October 23, 2008, Sheppard Mullin

4   filed reexamination request 95/000,383 seeking reexamination of U.S. Patent No.

5   6,719,434, despite protests from the patent-holder in the underlying patent

6   infringement litigation in the Central District of California that, for Sheppard Mullin

7   to file the request on the grounds it then threatened, "would amount to a frivolous

8   and abusive use of the reexamination procedure" and that "Defendants do not have

9   any grounds to assert another reexamination in the PTO." See Plaintiffs' Brief in

10  Response to Defendants' Motion for Clarification and Reconsideration of Order on

11  Motion to Limit Claims, (July 3, 2008) at 14 and 18 in Bruce Finn et al. v. Mole-

12  Richardson Company.   Sheppard Mullin filed the request for reexamination anyway,

13  and it was granted by the USPTO on January 12, 2009.  Yet on October 2, 2009, the

14  USPTO issued an office action confirming the patentability of all the original patent

15  claims over the prior art submitted by Sheppard Mullin (including a claim "amended"

16  by the patent owner merely to correct a typographical error).

17       50.   As a result of Defendants' misuse of the reexamination process, I have

18  been financially harmed in the following ways, including but not limited to: (1) the

19  loss of licensing relationships that would have resulted from my enforcement

20  program; (2) the loss of all profits and other economic benefits that would have been

21  realized as a result of those licensing relationships; (3) attorneys' fees in defending

22  my Patents before the USPTO due to fraudulent petitions submitted without probable

23  cause by Defendants; (4) the full and complete use of my property rights to my

24  Patents, which are granted me by federal law and the U.S. Constitution; (5) lost

25  opportunities for any and all other business relationships due to the reexamination

26  proceedings which cast a cloud of invalidity over my Patents; (6) the loss of costs

27  associated with professional analyses and licensing research I obtained from firms

28  that I employed; (7) the loss of costs incurred to develop my first enforcement

DECLARATION OF LAWRENCE B. LOCKWOOD

1   program in 2002; (8) the costs incurred to restart my enforcement program in 2008;

2   and (9) all other costs to successfully prove the Patents valid.  A detailed report of

3   the exact damages suffered is outlined in the Declaration of David Drews of Consor

4   Intellectual Asset Management, attached herein.

5          I declare under penalty of perjury under the laws of the State of California that

6   the foregoing is true and correct.

7          Executed this 21st day of October 2009, in Los Angeles, California

8

9

10                                    Lawrence B. Lockwood

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28