**EXHIBIT 32**

# GS The Green Sheet
*The Financial Services Industry Source for Education, Inspiration and Actionable Advice*

June 24, 2002
Issue 02:06:02

## Inside This Issue:

**Features**
- Changing Times, Changing Product Mix by Patti Murphy .................. 26
- Wal-Mart Seeking Approval to Acquire Bank by Eric Thomson ............ 30

**Company Profiles**
- Cynergy ................................................. 39
- Electronic Payment Systems ............................. 44
- Galaxy Payment Solutions ............................... 49

**News**
- A Call To Action For Authorize.Net .................... 22
- Yoga Acquires Third Company ........................... 43

**New Products**
- Good Things Come in Small Packages .................... 55
- Helping ATMs Become Web-Enabled ....................... 55
- Connect the Applications .............................. 56

**Inspiration**
- The Line That is Drawn ................................ 63
- Help Them, Make the Change ............................ 63

**Departments**
- Forum .................................................. 5
- MSOs .................................................. 57
- Datebook .............................................. 64
- Resource Guide ........................................ 66

# Nightmare on E-commerce Street

A patent-infringement lawsuit filed recently in a California court could alter the face of doing business on the Internet and potentially could be costly to every merchant who advertises and sells products via a Web site.

On April 4, 2002, 11 non-related businesses (see chart, Page 8) were served with a lawsuit by PanIP, LLC of San Diego. The suit contends that PanIP's two U.S. patents cover Web sites that contain both text and graphics and are capable of obtaining credit card or other financial information from consumers in order to process sales. It appears that PanIP contends that virtually every e-commerce Web site in the country infringes its patents unless otherwise licensed by PanIP – an eye-popping presumption, to be sure.

According to documents filed with the Superior Court for the Southern California District, the patents involved in the alleged infringement were designed, developed and filed by an inventor named Lawrence B. Lockwood. U.S. Patent No. 5,576,951 was issued to Lockwood on Nov. 19, 1996 for "automated sales and service system." Corresponding U.S. Patent 6,289,319 was issued to Lockwood on – of all days – Sept. 11, 2001 for "automatic business and financial transaction system."

PanIP (which stands for Pangea Intellectual Properties) was formed as a

See E-COMMERCE on Page 8



**Notable Quote:**
*Electronic prepaid card programs have great potential for helping acquirers and ISOs generate new revenues from the point-of-sale. No one wants to kill the goose that laid this golden egg.*

See Story on Page 26

Exhibit 32
Page 381

E-COMMERCE from Page 1

limited liability corporation in March 2002, the same month the complaints originally were filed. Not much other background information was readily available. Company officials are not speaking to the media because of alleged misquotes, according PanIP's attorney, Kathleen Walker. The company's Web site consists of a homepage that offers no data of any kind, save two text icons. One icon for "stats" requires a password to access, and the other icon for "patent directory" is non-functional.

However, Walker was willing to talk about the lawsuit. She said Lockwood has been an inventor in the computer field since the early '70s and has a number of e-commerce-related patents with another pending. Walker confirmed that PanIP is a limited liability corporation with a board of directors and less than 10 employees. According to Walker, it existed as another corporation before March 2002, but for tax and other related business purposes it was restructured as a limited liability corporation.

One of the first questions that comes to mind, of course, is why PanIP is undertaking this action.

"This is how inventors make their money," says Walker. "Patent is legalized monopoly, allowing for the inventor a period of time to monopolize his invention.

"The Constitution of the United States guarantees this. You can either exclude anyone else from using it or issue licenses. My client doesn't want to put anyone out of business or make it difficult for them to do business. He is willing to license his patent."

Lockwood is seeking $30,000 from each company for the lifetime of both patents. By law, a patent is viable for 17 years after issue date. After that, a patent becomes public

**Businesses Sued by PanIP**

Dickson Supply Co. ................ Brielle, N.J.
Snow Country Sports ............ Rochester, N.Y.
Furniture and Things ............ Elk River, Minn.
Fabric Depot, Inc. .................. Portland, Ore.
Backcountry Experience ...... Durango, Colo.
Electronic Express ................ Nashville, Tenn.
CP Industries .......................... Brooklyn, N.Y.
Peekay, Inc. ............................ Auburn, Wash.
Abe's of Maine ...................... Brooklyn, N.Y.
Video Age, Inc. ...................... Minneapolis
Art.com, Inc. .......................... Raleigh, N.C.



Triton 9100

FTI was named by INC. Magazine as one of the nation's fastest growing, privately held companies in 2000 and 2001.

**Are you tired of waiting months to get the industry's newest, most advanced ATM equipment?**

Whether it is the new Triton 9100 ATM or the FTI PayPort*, the country's first guaranteed ATM check-cashing system, Financial Technologies has the latest in cutting edge technology from the nation's major ATM manufacturers!

And, if you need another reason to call FTI, we can give you four. We provide our Distributors with

- Individualized Training
- Unequalled Support
- Upfront Commissions
- Long-term Residual Income

**800.523.2104 (x2176)**
or visit our website at www.fti.to

*Due to certain restrictions the FTI PayPort is only available in certain markets. Call to see if it is available in your area.


Financial Technologies

Exhibit 32
Page 382

domain, and anyone can use it after the end of that initial 17-year period without fear of lawsuit or license-fee mandates.

Another puzzling question: Why has Lockwood decided to file a lawsuit at this time? Walker says Lockwood's patents originally were filed as part of process that took years. "My client decided not to go after companies until the patent was issued," says Walker.

The choice of companies Lockwood elected to pursue is an interesting point as well. He hired a consulting firm, Chi Consulting, to select appropriate businesses to sue. According to a number of defendants, Chi Consulting accessed Dun & Bradstreet for its selection, determining proper names, addresses, credit history and gross sales.

According to Walker, all named defendants have annual sales in the $5 million to $10 million range, but she is quick to point out there wasn't a set strategy to initially sue the smaller fish in the e-commerce pond and leave the big fish alone.

"Infringement is infringement," says Walker. "There's no hierarchy. It's all up to the patent owner whom he wants to sue."

Another aspect that Walker attributes to the decision is the fact that patent-litigation costs a lot of money. "It could go on for years just to get to the point where arguments are heard," says Walker.

There are discovery motions, depositions and lots of documentation. This is a basic civil case, and since judges have a duty to hear criminal cases within a certain time period, civil cases get pushed back."

Big fish have big pockets, and since the 11 defendants named in the lawsuit don't, one could assume that Lockwood is probably hoping they will settle out of court and pay him a licensing fee. Walker confirmed that two defendants already have agreed to do just that, with a third one in negotiation.

But not all are buckling under the weight of the lawsuit. Five defendants have obtained the services of patent attorney Jonathan Hangartner of the San Diego law firm of Liu & Liu.

Walker believes Hangartner was hired because of the actions of one defendant, Dickson Supply Co. She claims that Dickson refused to settle and initiated a campaign against her client by contacting the other defendants, setting up a Web site (http://panipcase.homeip.net/) and writing propaganda related to the



Algunas cosas parecen iguales... hasta que las miramos de cerca.

Tomemos el caso de los procesadores, por ejemplo. La mayoría dicen ser bilingüe. Hasta que usted se da cuenta— cuando ya es tarde— que bilingüe para ellos significa tener una recepcionista que tomó clases de español en secundaria.

En Cynergy Data, sin embargo, somos total y completamente bilingües. En todos los departamentos, desde el proceso del papeleo hasta la apertura de nuevas cuentas para nuestros ISO y comerciantes. Cynergy Data está dedicada a ayudar a sus clientes a triunfar. Y lo hemos logrado. Por eso, nuestros clientes originales, son todavía nuestros clientes. Por eso, préstele atención a Cynergy Data. Y vea porque Cynergy Data es el último procesador que va a necesitar. Llame hoy mismo a Omar Demaria al número 1-800-933-0064, ext. 5750. Y tenga confianza al elegir su próximo procesador.



Make your next acquirer your last acquirer.

Crédito • Débito • Transferencia Electrónica de Beneficios y Proceso de Tarjetas de Regalo
Conversión de Cheques • Comercio Electrónico • Financiamiento Interno

www.cynergydata.com

Exhibit 32
Page 383

lawsuit.

"Dickson is saying he is not going to settle, based on principle," says Walker. "I gather this from the letters and press generated from him and his group of people. Dickson wrote an open letter to everyone, saying he is being attacked. That's not fair."

Walker continues, "When you sue someone, you anticipate a fight. We're saying we don't have to fight. All you need to do to save litigation money is pay a fair fee. But if you want to go to court, we are certainly willing to do that. We believe in the patent, obviously, or we wouldn't bring a case to court that we thought we were going to lose."

In actuality, Hangartner initially was retained by another defendant, the Snow Country Sports of Rochester, N.Y., in part because of a longstanding friendship between his family and the owners of Snow Country. Hangartner subsequently talked to the other defendants to see how they wanted to respond to the lawsuit.

As a result, four others, including Dickson, chose to fight the lawsuit and joined forces with Snow Country. "My clients agreed they did not want to pay what they saw as a ransom to this guy and have pooled their resources," says

Hangartner. "They have collectively filed a motion to dismiss."

The papers were filed in court June 10, 2002. The motion to dismiss contains variations on a request for dismissal, including lack of jurisdiction for some defendants, but all specify a failure by PanIP to state a legitimate claim of infringement against them. Basically, they see the complaint as inadequate and vague.

"We believe this is a frivolous case," Hangartner says. "There are no merits to this case. We believe the patent does not cover any form of e-commerce."

Does Hangartner believe his clients will win? "I am a trial lawyer, and most trial lawyers who think they have a slam-dunk case will tell their client they have a 75% chance of winning," he says. "In this instance, I'm telling my clients we have a very strong case, but I'm not putting a percentage on it."

Aside from his clients who already have come under attack, Hangartner sees other companies vulnerable as well. "I believe all companies who do business on the Internet are vulnerable to this type of frivolous litigation. Anybody with a Web site is vulnerable to being sued by PanIP, but not based on what is in this particular complaint. The complaint doesn't shed much light on the specifics surrounding the alleged infringement claims."

Hangartner continues, "One of the things I found hysterical is based on what the patent claims. They could sue the U.S. Patent Office itself since the Patent Office sells stuff on its Web site as well."

If PanIP wins, Hangartner believes more retailers, credit card companies, financial institutions and even software companies will be targeted.

"If they prevail, they very well could go after everyone in the e-commerce chain," says Hangartner. "This guy would be entitled to set up licensing agreements with every e-commerce provider in the world who offers their business in the United States."

Hangartner sees a number of scenarios occurring if PanIP loses.

"If the case is thrown out, it wouldn't prevent PanIP from suing others," says Hangartner. "If the patent is invalidated, that would prevent any future lawsuits."

Obviously, the group is hoping for the latter. "This is why we are looking for industry support," says Hangartner. "We want to put this guy out of business, but to get that far in litigation is extremely expensive. We have five who are



Exhibit 32
Page 384

ready to fight and are looking for others to help us in this fight. We see it as a bigger issue than just winning a lawsuit. We're putting ourselves out there to prevent this from happening to the next guy down the line."

Dickson Supply is a third-generation family business that opened its doors in 1946. It employs 25 at its single location and is a distributor of plumbing, heating, hardware, gas barbeque equipment and irrigation products.

Dickson Supply recognized the benefits of technology early on, buying its first computer in 1981 and putting up its Web site in 1996. Its first online sale was in 1998, and since then Dickson has worked hard to develop a world-class site to complement its growing business.

"We have one of the more formidable Web sites in our retail space," say Allan Dickson, President/CEO of Dickson Supply. "This isn't a valid patent. It's using a duck, saying it's a bird, and it could cost me a million dollars to prove it's a duck."

Dickson was served at his office April 4, the same day all 11 named defendants were served across the country. Dickson immediately took the document to his Webmaster, and the two of them tried to decipher the patents in question.

"It was a horrible document to try to read," says Dickson. "I wonder what a jury would do and how they'd interpret it. My techies looked at it and commented that it resembled a high school project from the '80s."

Because of his inability to clearly understand it, Dickson contacted the plaintiff's attorney for a clarification of the alleged wrongdoings. "She asked me if I had a Web site and if I displayed items for sale on that Web site using graphics or text," says Dickson. "I said yes, and she said then I was infringing on her client's patent. It was unbelievable.

"She then asked me if I had a method for people to put in financial information for transactions on my Web site. I said yes, and she then informed me that was the other way I was infringing on the patent. She also said, 'By the way, my client has another patent pending, and most assuredly you will be violating that patent as well.' "

After his initial shock, Dickson looked for a way to avoid a court fight. "I asked her what she had in mind so that we could all get in the same corner," says Dickson. "She told me they'd want to audit me because they didn't know how much business I had transacted using the patents and that I would also have to pay a license fee in settlement of the lawsuit. When I asked her for her



Exhibit 32
Page 385

recommendation, she advised me to call an attorney."

In his 30 years in business, Dickson never had been involved in litigation and certainly didn't have a lawyer who dealt with patent-litigation matters. He knew he had a problem. He found the solution with fellow defendants in the form of Jon Hangartner.

"We all discussed options," says Dickson. "No matter when or how it gets dealt with, this lawsuit will involve a lot of time and money in attorneys' fees. I've discovered that patent litigation is very expensive with long, ongoing technical and detailed fights. It could run into millions. The word extortion has come up in many conversations in many places."

Dickson says businesses both large and small from all over the country have contacted the defendants to offer their support.

"I'm working day and night on this situation. It's got my goat," says Dickson. "I've discussed it with Heartland, my processor. I've even discussed it with my competitors. I feel a responsibility to the business community to tell them this patent exists and this lawsuit is happening, even if we get our asses handed to us."

Dickson sees the 11 defendants as the low-hanging fruit on the tree. "It wasn't luck that we got picked first," says Dickson. "PanIP had to start somewhere. They're not looking for the biggest but the best fit for a settlement. It's all about money. They went out looking for someone just the right size to write a check as opposed to someone who was so formidable as to bring in a team of 18 lawyers and crush them."

If all 11 defendants had to pay licensing fees, the total would be $330,000, not including attorneys' fees, penalties, etc.

"If we fail and people pay up and give this lawsuit legitimacy by settling, it's going to make it harder for the next round," says Dickson. "We've been told this is just the first round and the tip of the iceberg. The word 'war chest' was even used by the plaintiff's attorney. The first round of building their war chest is trying to get 11 companies to put $330,000 on the table without a lot of sweat equity."

Dickson sees this as a gross misuse of the patent system and believes it needs revamping. "As a taxpayer and a citizen, the courts just shouldn't be burdened with crap like this," he

**There is more to a leasing company than just good rates...**
*But good rates certainly don't hurt.*

Here is the 8—r
PA - .0289
A  - .0299
B  - .0309
C  - .0325
D  - .0399



*Merchants Leasing Systems Inc.*

  

*Call us anytime and see for yourself why good rates are just the beginning...*

*For more information call: (877) 642-7649*

Exhibit 32
Page 386

Case 2:09-cv-05157-JFW-AGR   Document 49-35   Filed 10/22/09   Page 8 of 9   Page ID #:1255

pending, and most assuredly you will be violating that patent as well.'"

After his initial shock, Dickson looked for a way to avoid a court fight. "I asked her what she had in mind so that we could all get in the same corner," says Dickson. "She told me they'd want to audit me because they didn't know how much business I had transacted using the patents and that I would also have to pay a license fee in settlement of the lawsuit. When I asked her for her recommendation, she advised me to call an attorney."

In his 30 years in business, Dickson never had been involved in litigation and certainly didn't have a lawyer who dealt with patent-litigation matters. He knew he had a problem. He found the solution with fellow defendants in the form of Jon Hangartner.

"We all discussed options," says Dickson. "No matter when or how it gets dealt with, this lawsuit will involve a lot of time and money in attorneys' fees. I've discovered that patent litigation is very expensive with long, ongoing technical and detailed fights. It could run into millions. The word extortion has come up in many conversations in many places."

Dickson says businesses both large and small from all over the country have contacted the defendants to offer their support.

"I'm working day and night on this situation. It's got my goat," says Dickson. "I've discussed it with Heartland, my processor. I've even discussed it with my competitors. I feel a responsibility to the business community to tell them this patent exists and this lawsuit is happening, even if we get our asses handed to us."

Dickson sees the 11 defendants as the low-hanging fruit on the tree. "It wasn't luck that we got picked first," says Dickson. "PanIP had to start somewhere. They're not looking for the biggest but the best fit for a settlement. It's all about money. They went out looking for someone just the right size to write a check as opposed to someone who was so formidable as to bring in a team of 18 lawyers and crush them."

If all 11 defendants had to pay licensing fees, the total would be $330,000, not including attorneys' fees, penalties, etc.

"If we fail and people pay up and give this lawsuit legitimacy by settling, it's going to make it harder for the next round," says Dickson. "We've been told this is just the first round and the tip of the iceberg. The word 'war chest' was even used by the plaintiff's attorney. The first round of building their war chest is trying to get 11 companies to put $330,000 on the table without a lot of sweat equity."

Dickson sees this as a gross misuse of the patent system and believes it needs revamping. "As a taxpayer and a citizen, the courts just shouldn't be burdened with crap like this," he says. "Right now, PanIP won't mess with big companies and financial institutions; just the little guys who don't know a lot about patent

Exhibit 32
Page 387

litigation and don't have the means to sustain it."

But perhaps there is another reason Lockwood and PanIP are not going after major players at this time. It just might have to do with the result of a previous lawsuit Lockwood filed against American Airlines.

Lockwood had been issued an e-commerce patent and believed that American Airlines' reservation system was infringing on it, but his claim was declared invalid after 10 years of litigation. According to Walker, the case went all the way to the Supreme Court.

"I admit there could be a bad taste left in my client's mouth from the American Airlines lawsuit," says Walker. "And, yes, it would strengthen a claim against bigger companies with a win over the little guys."

Clearly, the defendants fighting this lawsuit do not want 10 years to go by before a decision is made.

Walker says it is "most likely" Lockwood will pursue additional lawsuits after this one is settled. "It is his intention to protect his patent," she says.

Is Lockwood getting the message out to the industry about those patents? "It is not his duty to do that," says Walker. "Once the patent is issued, it is public knowledge, but this industry is not driven by patents like others - say, the medical profession. A lot of these people don't know about patent law and wouldn't do a search."

PanIP hasn't even issued press releases regarding its patents. "My client is staying away from the press," says Walker. "He's gotten death threats. I've even gotten obscene e-mails."

According to Walker, cyberhackers harassed her client by shutting down his Web site through a simultaneous overload of hits.

"One person even sent an e-mail saying, 'Send an unmanned guided missile to blow up his office.' To me, it sounds like crazy chatroom discussions by people who don't know what they're talking about and are addicted to the Internet. It's a shame. My client did come up with this technology, and the only way he can make a living is selling this technology. All these companies are making a profit on his technology. In the scope of things, he's asking for a very limited amount."

Her advice to merchants, processors and the like: "If I was a retailer and I had a Web site and I learned about this patent, I would go to a lawyer and see if I was infringing."

---

**Enjoy Our Other Services:**

Exhibit 32
Page 388